[Civ. No. 43100. Second Dist., Div. Four. Feb. 27, 1975.]

ALFREE CADE et al., Plaintiffs and Appellants, v.
MID-CITY HOSPITAL CORPORATION et al.,
Defendants and Respondents.

590

---

**COUNSEL**

Douglas G. Gray for Plaintiffs and Appellants.

David Hyatt, Robert A. Stewart, Jr., Robert D. Bash, Spray, Gould & Bowers, Daniel O. Howard, Bonne, Jones & Bridges, Ellis J. Horvitz and Gerald H. B. Kane for Defendants and Respondents.

## OPINION

**JEFFERSON, J.**—Plaintiffs Alfree Cade, Antoinette Houston and, by Alfree Cade, their guardian ad litem, minors Norwood, Michael, Mitchell and Majda Cade, filed a complaint for damages for the alleged wrongful death of Myrtle Cade, Alfree's wife and the mother of the other five named plaintiffs, against defendants Mid-City Hospital, a corporation; the County of Los Angeles;[1] Bassett H. L. Brown, M.D., and Newton Woodard, M.D.; Lincoln R. Best, M.D.; and Does I through X. Later Charles E. Weinstein, M.D. and David Fiske, M.D. were served as Does I and II, respectively. The complaint alleged the negligence of Mid-City Hospital and of Los Angeles County-USC Medical Center, and also alleged negligence resulting from the malpractice of medicine by the defendant doctors as the proximate cause of Mrs. Cade's death.

Trial was by jury. The jury returned a verdict exonerating all of the defendants. Plaintiffs appeal the judgment, which we affirm. Our factual recital includes, as it must, the evidence most favorable to the defendants, the prevailing parties in the trial court. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 248, 249, pp. 4240-4241.)

In 1969, Myrtle Cade was 43 years of age, and employed as a clerical worker by defendant Mid-City Hospital,[2] a small private institution located in south central Los Angeles. There she became acquainted with defendant Dr. Woodard, a surgeon on the hospital staff, who was engaged in both the practice of surgery and the general practice of medicine in partnership with defendant Dr. Brown, at a clinic next to the hospital.

In July of that year, Mrs. Cade started to feel badly, complaining of a runny nose, a cough and persistent high temperature. She sought treatment from Dr. Woodard, who prescribed certain medication which caused nausea but resulted in the abatement of some of her symptoms. However, the high temperature remained. Because of the "fuo" (fever of undetermined origin), Dr. Woodard sent Mrs. Cade to the radiology department at Mid-City Hospital on August 5, 1969, for a chest X-ray. This department was operated by defendant Dr. Weinstein on an independent contractor basis with the hospital. The radiologist super-

[1]Nonsuit was granted the County of Los Angeles, after the conclusion of plaintiffs' opening statement to the jury.

[2]As Mrs. Cade's employer, Mid-City was exposed to potential liability, either on the ground of negligence if the illness was not work related, or, in the alternative, if the illness arose out of her employment, under the workmen's compensation law.

vised the taking of one lateral X-ray and two post-anterior X-rays; the second "p-a" was taken because he was dissatisfied with the quality of the first one. These X-rays, viewed in relation to a previous X-ray of Mrs. Cade's chest taken in January 1969, revealed no significant changes or abnormalities.

The fever persisted, and on August 9, 1969, Dr. Woodard had Mrs. Cade admitted to Mid-City in order to conduct a series of diagnostic tests to identify the cause. On the day of admission, Dr. Brown, who sometimes attended to the partnership's hospital patients, ordered by telephone a number of such tests, including blood, urine and sputum tests. On August 11, Dr. Woodard ordered a lung scan, a procedure often utilized to detect the presence of disease in the lungs. The lung scan, taken on August 12, showed nothing, nor were the other routine tests definitive.

Witness Curtis Antoine, an X-ray technician, supervised by the radiologist on duty, Dr. Edward Glazier, in the radiology department, testified that when he performed the lung scan on August 11 he asked Mrs. Cade to submit to an X-ray, as it was established policy to take an accompanying film if one had not been made within a 24-hour period. Mrs. Cade refused, stating that she had just had an X-ray. Antoine communicated the patient's refusal to Dr. Glazier, who noted it on Mrs. Cade's X-ray film jacket and, following established policy, he told Antoine to be certain to tell Mrs. Cade's ward nurse, so that the attending physicians would learn of the refusal. Antoine testified that he did in fact communicate this information to nurse Jackson. The medical records of the hospital did not show any entry concerning this refusal on Mrs. Cade's chart.

On August 12, Dr. Woodard arranged a consultation with defendant, Dr. Best, a specialist in internal medicine. Dr. Best examined Mrs. Cade, and reviewed her medical records; he recorded his consultation notes but made no firm diagnosis; he advised, among other things, that another chest X-ray be taken. Since it appeared to him that some of the patient's symptoms were consistent with hepatitis, Dr. Best suggested that the attending physicians consider a liver biopsy. (Expert testimony at trial established that a liver biopsy is not an inconsequential surgical procedure; it is contra-indicated if the patient demonstrates any problem with the blood, i.e., bleeding or clotting, because the danger of hemorrhage is present.)

Dr. Best's notes also reflect that he had been informed of the patient's refusal to have a chest X-ray, and he stated therein that he had encouraged her to allow one to be taken the following day, August 13. Since Dr. Woodard reviewed Dr. Best's notes, he was aware of the refusal problem.

The X-ray ordered by Dr. Best was never taken, and the reason for this omission was explored at trial in somewhat confusing testimony. The ordinary procedure employed at Mid-City for carrying out a doctor's order for a chest X-ray was that ward personnel prepared a requisition slip and sent it to the radiology department. Head nurse Ladoceour, on duty during the time in question, testified at trial that notations on the patient's chart established that the slip was prepared according to Best's order, but no slip was ever found either in Mrs. Cade's chart or at the department of radiology, nor was there any notation on any record that the radiology department ever received the requisition. Neither Dr. Glazier, the radiologist on duty, nor his employer, Dr. Weinstein, had any knowledge of the Best X-ray order. Witness Antoine, however, testified further at trial that in response to the second X-ray order he again attempted to bring Mrs. Cade to Radiology for an X-ray, and that again she refused the procedure. The daily nursing notes on Mrs. Cade contained no mention of either refusal, but they did reflect that Mrs. Cade was, on occasion, refusing other items of routine nursing care.

On August 13 Dr. Brown, unaware that Dr. Woodard had called Dr. Best in to consult, arranged a consultation by Dr. Fiske, also a specialist in internal medicine. Dr. Fiske saw Mrs. Cade on the 13th, reviewed her records, recommended a chest X-ray and an "EKG," i.e., electrocardio-gram. Dr. Fiske became aware that another specialist had already seen the patient, and indicated that he would not proceed further with the case unless called upon to do so.

By August 16, Dr. Best, who had seen Mrs. Cade regularly since called in to consult, had reviewed tests measuring her liver function, and had arrived at the conclusion that the patient had hepatitis. By this time Mrs. Cade was evidencing obvious signs of jaundice, indicative of hepatitis. Dr. Best wrote his notes, and then went on vacation.

There is little evidence concerning what steps were taken by attending physicians Woodard and Brown between August 16 and the 23d to treat the diagnosed condition of hepatitis. A blood test during this period established that abnormalities were present, and a liver biopsy was not

attempted. It was also considered unnecessary because a diagnosis had been reached. Mrs. Cade's condition, however, steadily worsened. Her family visited her on a daily basis and were shocked and alarmed by her appearance and obvious distress. She finally said she did not wish the children to continue to visit her and see her condition.

On August 23, Mr. Cade received a telephone call from a nurse named Walker (who did not testify at trial) who told him that she had been attending Mrs. Cade, and that Mrs. Cade was not improving but was severely ill and should be taken elsewhere for treatment. Mr. Cade went to the hospital and ordered his wife's removal to the Los Angeles County—USC Medical Center. Dr. Brown had that day again called in Dr. Fiske because of Mrs. Cade's deteriorating situation, and Dr. Fiske encouraged the transfer to the county facility; Mrs. Cade was now lapsing in and out of consciousness; her kidney and liver functioning were severely impaired; she was dying, and in need of the superior life-support systems available at the county institution.

She arrived there on the afternoon of August 23, and was examined by Dr. Fox, a first-year resident. He regarded her condition as critical and, after consulting with a third-year resident, made a diagnosis of viral hepatitis. He, too, ordered a chest X-ray, which was taken on August 24 at Mrs. Cade's bedside with a portable machine because she was too ill to be moved. The X-ray disclosed abnormality in one lung, which appeared to be pneumonia.

Myrtle Cade died on August 25. An autopsy was conducted thereafter by pathologist Oliver S. Miller, M.D. Dr. Miller testified at trial that his initial "gross" examination (made without penetrating any of the various body organs) revealed nothing definitive; it was only after he had cut into various organ tissues that he discovered the minute lesions, and subsequently, a small number of bacteria (by microscope) which are evidence of an uncommon and lethal, if undetected, form of tuberculosis, namely, miliary tuberculosis.[3]

---

[3]"Q. What first brought tuberculosis to your attention?
"A. Well, to go through the sequence, we looked at the liver and with the history from the other hospital and this hospital everybody would think of infectious hepatitis. Looking at the liver, it was compatible. So, at this time I called one of my staff, called someone—I don't remember—to do a frozen section on the liver, and by that time I completed the Rocitinsky and took a look at the kidneys and then started seeing millet seed type of nodules you expect to see with miliary tuberculosis, and I yelled for one of the men, whoever is doing the frozen, to stop, because with tuberculosis this is a good way to get exposure, during frozen section."

The disease derives its name from the millet seed, because the lesions formed by the bacteria during the course of the disease are about the size of such a seed, approximately four or five millimeters in diameter, the size of a pinhead. This contrasts with the more common form of tuberculosis which is evidenced by large lesions in the lungs which may be seen by X-ray. Bacteria of the miliary type are airborn, enter the human bloodstream and attack various body organs, including the kidneys, the liver and the lungs. According to Dr. Fox, who testified for the defense at trial not only as an attending physician but as an expert on tuberculosis, the disease is more prevalent in children than adults and appears more often in groups which experience the conditions of poverty.

The disease is difficult to diagnose; it is now relatively rare, and is hard to detect because of the size of the lesions produced. Dr. Joseph Boyle, an expert on chest diseases who testified for the defense, stated that in 25 percent of the cases the lesions formed are so small that they would never be detected by X-ray; as the disease progresses, they may or may not be seen by this method.

Dr. Daniel Simmons, the plaintiffs' medical expert, testified initially on direct examination that had a proper X-ray been taken of Mrs. Cade's lungs on August 12 or 13 it was probable that lesions could have been detected, although his later testimony became very equivocal in view of the fact that the X-ray taken at the county hospital on August 24 (admittedly less qualitative because it was taken by portable equipment) did not reveal them, and that in fact they were only discovered after microscopic examination during the autopsy.

Dr. Simmons also testified that had a bone marrow test been given Mrs. Cade or a liver biopsy performed in time, presence of the disease could have been disclosed. He was dissatisfied with the quality of the August 5 X-rays,[4] but conceded that it was unlikely that miliary tuberculosis could have been diagnosed at that point in the progression of the disease. Had the disease been properly diagnosed, according to Dr. Simmons, there were drugs ("INH, streptomycin, PAS and others") which could have effected a cure. The attending physicians, according to all of the experts, correctly diagnosed the impairment of Mrs. Cade's liver and kidneys, but incorrectly assumed that the cause of the impairment was hepatitis rather than miliary tuberculosis.

[4]His view that the X-rays were substandard was disputed at trial by Dr. Boyle and by Dr. Bonoff, a specialist in diagnostic radiology, and by other physicians involved.

Briefly summarized, plaintiffs' contentions at trial were that Mid-City Hospital was negligent for its failure to follow the order of consultant Best for a chest X-ray; Dr. Weinstein was liable for malpractice because of the allegedly substandard quality of the August 5 X-rays; Drs. Brown and Woodard, the attending physicians, were liable because they failed to exercise the standard of care exercised by reputable general practioners of medicine in the community; Drs. Best and Fiske[5] were, in their capacities as specialists in internal medicine and consultants, liable for failure to meet the standard of care required of them. As indicated, the jury determined these issues adversely to the plaintiffs. Plaintiffs do not question the sufficiency of the evidence supporting the defense verdict, and that is understandable after review of the substantial expert testimony offered by the defense that there was no negligence here.[6]

Plaintiffs do raise two contentions on this appeal.

■ The first is that the trial court committed reversible error by refusing to instruct the jury on the doctrine of negligence per se, as set forth in BAJI No. 3.45, and plaintiffs' special instruction No. 2.[7]

The negligence per se doctrine actually relates to the burden of proof, and has been long recognized in California. (*Alarid* v. *Vanier*, 50 Cal.2d 617 [327 P.2d 897].) In 1967, it was included in the Evidence Code, section 669. Subdivision (a) of section 669 provides:

"The failure of a person to exercise due care is presumed if:

"(1) He violated a statute, ordinance, or regulation of a public entity;

---

[5]During closing argument, plaintiffs' counsel in effect conceded the absence of evidence showing malpractice on the part of Dr. Fiske, but informed the jury that he had been joined as a defendant to preclude the other defendants from placing the blame on him. On appeal, counsel for plaintiffs stated no reversal was sought as to Dr. Fiske.

[6]In *Bardessono* v. *Michels,* 3 Cal.3d 780, at page 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717], the California Supreme Court stated: "The courts require only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of the medical profession under similar circumstances."

[7]Plaintiffs' special instruction read:

"The Administrative Code of the State of California in full force and effect at the time of the accident, contained the following provisions:

"287. Orders for Medication and Treatment.

"(a) No medication or treatment shall be given except on the signed order of a person lawfully authorized to give such order. In case of emergency such order may be given by telephone, and shall be signed within 48 hours.

"(b) Medications and treatments shall be administered as prescribed and recorded in patients' records."

"(2) The violation proximately caused death or injury to person or property;

"(3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and

"(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."

If the four elements set forth above are established, a presumption of negligence arises and the burden of proof shifts to the defendant to persuade the trier of fact that he "did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances . . ." (Evid. Code, § 669, subd. (b); see also *Haft* v. *Lone Palm Hotel*, 3 Cal.3d 756, 765 [91 Cal.Rptr. 745, 478 P.2d 465], which involved violations of swimming pool regulations.)

Plaintiffs' argument is that they were entitled to the benefit of this instruction because of the failure of Mid-City Hospital to comply with Dr. Best's August 12 chest X-ray order. They particularly rely on subdivision (b) of 17 California Administrative Code, section 287, i.e., "(b) Medications and treatments shall be administered as prescribed . . ." in seeking to establish that the evidence was such that a violation of the regulations could have been inferred by a properly instructed jury.

How the four elements of section 669 are considered is the subject of Law Revision Commission comment following that section in the Evidence Code. The last two elements are determined by the trial court as a matter of law, since they involve statutory interpretation (*Nunneley* v. *Edgar Hotel*, 36 Cal.2d 493 [225 P.2d 497]), while the first two elements are regarded as factual matters to be determined by the jury.

Since the trial court refused to present this issue to the jury, we assume that the court determined, as a matter of law, that the regulation under consideration either was not intended to protect a class of persons of which Mrs. Cade was a member, or was not designed to prevent the type of injury which occurred.

Article 6 of title 17, in which regulation section 287 appears, sets forth a number of regulations which appear to have the objective of protecting hospital patients from the results of care provided by unqualified

hospital, medical and dental personnel. Regulation section 287 appears designed to provide protection to hospital patients such as Mrs. Cade from injuries which might follow from an *unauthorized* medical procedure, whether for diagnostic or treatment purposes.[8] Reading subdivision (b) in context with (a), of 287, it appears that (b) was intended to ensure that the written directions in (a) would be followed and recorded properly.

Plaintiffs contend that a literal reading of the regulation requires the conclusion that not only may hospital personnel not engage in unauthorized procedures, but they *must* follow the orders given or violate the section. We regard the proposed interpretation as overly broad and one which could conceivably result in absurdity. (We are compelled to give a reasonable and common sense construction to the regulation. 45 Cal.Jur.2d, Statutes, § 116, pp. 625-626.)

We therefore avoid an interpretation which would make the failure to follow every medical order a violation of section 287; such absurdities as placing hospital personnel in the potential position of choosing between negligence or, in the case of a difficult patient, liability for intentional torts are thereby avoided. Omissions of duty, as distinguished from *unauthorized* acts, are not regulated.

Since the regulation prohibits unauthorized conduct, it was intended to prevent injuries occurring as a result, and the evidence establishes that the injury to Mrs. Cade did not result from unauthorized procedures. Thus, it was not the type of injury the regulation was intended to prevent (*Mark* v. *Pacific Gas & Electric Co.,* 7 Cal.3d 170 [101 Cal.Rptr. 908, 496 P.2d 1276]) and the third element of section 669 was lacking. We conclude that the trial court properly determined as a matter of law that the instruction was inapplicable to the present case.[9]

---

[8]Respondents attempt to distinguish between treatment and diagnosis in determining the application of the regulation. Since sophisticated diagnostic procedures may result in serious injury, we assume the regulation was intended to prevent their undertaking without proper authorization.

[9]While the proximate causation between the violation of the regulation and the injury is ordinarily a question of fact for the jury, there is authority for the rule that when the evidence is such that only one reasonable inference may be drawn from it the trial court may remove the issue from the jury. (*Satterlee* v. *Orange Glenn School Dist.,* 29 Cal.2d 581 [177 P.2d 279].) Given the overwhelming testimony that an X-ray on August 12 or 13 would not have resulted in detection of the disease, the trial court could justifiably have taken that action here. Further, in view of the testimony concerning the patient's refusal to allow this medical procedure, it is unlikely that, had the instruction been given, the jury would have resolved the issue differently.

■ Plaintiffs also contend that the trial court committed reversible error by its refusal to grant plaintiffs a continuance for the purpose of presenting to the jury the testimony of an expert witness, Dr. Steckel, a radiologist.

The record discloses, first of all, that plaintiffs intermittently throughout trial had misjudged the time element of the case. Prior to the continuance request, the trial court had had to adjourn proceedings early because plaintiffs were out of witnesses to present at the session.

Before the conclusion of plaintiffs' case, counsel for plaintiff informed the court in chambers that he had been notified by Dr. Steckel's secretary that the doctor was ill with the flu and would be unable to appear until the following week. At that point counsel's major concern appeared to be that the jury understand the reason for Dr. Steckel's nonappearance; the judge advised counsel that he would not discuss the matter with the jury unless he received a confirming medical report on the witness's illness. Counsel for plaintiffs indicated that he would obtain such a report, and also that he felt he could rest without presenting Dr. Steckel, and possibly would use him on rebuttal.

These events occurred on Wednesday, January 31, 1973, and shortly thereafter courtroom proceedings resumed and the plaintiffs rested. On Thursday, February 1, while the defense was in progress, plaintiffs presented a letter from Dr. Steckel's attending physician indicating that he could not appear that week. The court commented that it did not constitute a declaration under penalty of perjury. Then, as the defense case was drawing to a close, and it appeared that the case could go to the jury on February 2 (Friday), plaintiffs moved for a continuance to Monday, February 5, at which time presumably Dr. Steckel would be able to testify. Counsel for plaintiffs stated he offered to prove that Dr. Steckel would testify that the August 5 X-ray of Mrs. Cade was not diagnostic and that, had a proper X-ray been taken August 12, it was his opinion that it would have shown the presence of tuberculosis.

The court denied counsel's motion.

■ It is elementary that the trial judge's discretion in granting or denying a continuance in a particular case is broad, and his action either way is usually upheld on appeal, unless it appears that a denial of the continuance motion resulted in the denial of a full and fair hearing. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 7, p. 2865.) Unavailability of a witness, or the absence of evidence, may be proper grounds for a continuance. (4 Witkin, *supra,* § 13, p. 2870.)

Code of Civil Procedure, section 595.4 provides: "A motion to postpone a trial on the ground of the absence of evidence can only be made upon affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to procure it. The court may require the moving party, where application is made on account of the absence of a material witness, to state upon affidavit the evidence which he expects to obtain; and if the adverse party thereupon admits that such evidence would be given, and that it be considered as actually given on the trial, or offered and overruled as improper, the trial must not be postponed."

While the showing by affidavit has not been regarded as mandatory (see *Taylor* v. *Bell,* 21 Cal.App.3d 1002 [98 Cal.Rptr. 855]) it reflects the policy of encouraging prompt trial of lawsuits. (See also, Cal. Rules of Court, rule 224.)

■ In the case before us, the plaintiffs chose to rest without making a formal request for continuance; as the defense proceeded to demolish the testimony of their primary expert, Dr. Simmons, plaintiffs became more interested than they had been previously in obtaining solid "backup" testimony from an additional expert. Hence the belated effort to obtain more time.

It is of importance that Dr. Steckel, according to plaintiffs' own offer of proof, was not expected to give new, innovative testimony but was expected to support Dr. Simmons' point of view. In *People* ex rel. *Dept. Pub. Wks.* v. *Busick,* 259 Cal.App.2d 744, at page 749 [66 Cal.Rptr. 532], the court observed that "an abuse of discretion not to grant such a motion [may be found], especially where the witness is the only person who can establish essential facts. [Citations.]" Such was not the case here.

As stated in *Busick, supra:* ". . . a legion of cases repeat the rule that the trial court's decision will not be reversed on appeal except upon a clear showing of an abuse of discretion." Given the state of the evidence at the time plaintiffs' counsel finally made his motion, it seems unlikely that, had his motion been granted and the testimony of Dr. Steckel heard, the result would have been appreciably altered.

Judgment affirmed.

Files, P. J., and Dunn, J., concurred.