[Civ. No. 51350. Second Dist., Div. Four. Dec. 21, 1978.]

RICHARD RODRIGUEZ et al., Plaintiffs and Appellants, v.
McDONNELL DOUGLAS CORPORATION,
Defendant, Cross-complainant and Respondent;
NORMAN ENGINEERING COMPANY,
Defendant, Cross-complainant and Appellant;
BETHLEHEM STEEL CORPORATION,
Defendant, Cross-defendant and Appellant;
COX BROTHERS CRANE SERVICE,
Defendant, Cross-defendant and Respondent;
ORVIN ENGINEERING COMPANY, Cross-defendant and Appellant;
STATE COMPENSATION INSURANCE FUND,
Intervener and Respondent.

**COUNSEL**

Ned Good for Plaintiffs and Appellants.

LaFolette, Johnson, Schroeter & DeHaas, Daren T. Johnson, Alfred W. Gerisch, Jr., and Dennis K. Ames for Defendant, Cross-complainant and Appellant.

Lillick, McHose & Charles, Gordon K. Wright, Daniel C. Minteer and Baker O. Terry, Jr., for Defendant, Cross-defendant and Appellant.

Henry J. Bogust, Toni Rae Bruno, Chase, Rotchford, Drukker & Bogust and James E. Cusick for Cross-defendant and Appellant.

Waters, McCluskey & Corcoran and Gerald E. McCluskey for Defendant, Cross-complainant and Respondent.

Bolton, Hemer & Dunn and Bruce H. Dunn for Defendant, Cross-defendant and Respondent.

T. Groezinger, James J. Vonk, Arthur Hershenson, George S. Bjorsen and Steven Helfend for Intervener and Respondent.

## OPINION

**JEFFERSON (Bernard), J.**—By an amended complaint, plaintiff Richard Rodriguez sought recovery for personal injuries sustained while he was working on the premises of McDonnell Douglas Corporation (hereinafter, McDonnell). Named as defendants were McDonnell, its general contractor—Norman Engineering Company (hereinafter Norman), a subcontractor—Bethlehem Steel Corporation (hereinafter Bethlehem), Cox Brothers Crane Service (hereinafter Cox) and H. H. Robertson Company (hereinafter Robertson).

Joined with Richard Rodriguez as a plaintiff was his wife, Mary Anne, suing for her damages for loss of consortium.[1]

Defendants answered the complaint, denying the material allegations of negligence[2] and raising the defense of contributory negligence on the part of both plaintiff Richard Rodriguez and his employer, Orvin Engineering Company (hereinafter Orvin).

McDonnell cross-complained for indemnity against Norman, Orvin, Bethlehem, Cox, Twining Laboratories of Southern California, Inc. (hereinafter Twining) and Robertson.

---

[1]A cause of action for damages for loss of "consortium" is for loss of conjugal fellowship and sexual relations. This cause of action is now recognized in California by virtue of plaintiff Mary Anne's prior appeal from a judgment of dismissal of her cause of action following the sustaining of general demurrers without leave to amend. (*Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669].)

[2]Included in the complaint was a fourth cause of action based on strict liability in tort. This cause of action was dismissed.

Norman cross-complained for express indemnity against Bethlehem and Orvin.

The State Compensation Insurance Fund (hereinafter State Fund) intervened in the action to secure reimbursement for workers' compensation benefits provided to plaintiff Richard Rodriguez.

Trial was by jury, commencing in November 1975. During trial, plaintiffs and intervener State Fund dismissed their complaints against Robertson. McDonnell dismissed its cross-complaint against Robertson and Twining.

After approximately three months of trial, the jury returned a special verdict or special findings.[3]

[3]The special verdict or findings was as follows:
"We, the jury in the above entitled case, find the following Special Verdict on the issues submitted to us:
*"Issue No. 1.*
"a. Was there negligence on the part of defendant McDonnell Douglas Corporation which was a proximate cause of injury to the plaintiff Richard Rodriguez?
"Answer 'yes' or 'no.'
"Answer: No
"b. Was there negligence on the part of defendant Norman Engineering Company which was a proximate cause of injury to the plaintiff Richard Rodriguez?
"Answer 'yes' or 'no.'
"Answer: Yes
"c. Was there negligence on the part of defendant Bethlehem Steel Corporation which was a proximate cause of injury to the plaintiff Richard Rodriguez?
"Answer 'yes' or 'no.'
"Answer: Yes
"d. Was there negligence on the part of defendant Cos [*sic*] Brothers Crane Service which was a proximate cause of injury to plaintiff Richard Rodriguez?
"Answer 'yes' or 'no.'
"Answer: No
"If you have answered any part of Issue No. 1 'yes,' then answer the next issue.
*"Issue No. 2.*
"Without taking into consideration the question of reduction of damages due to the amount of compensation benefits paid to or for the plaintiff Richard Rodriguez, what do you find to be the total amount of damages suffered by the plaintiff Richard Rodriguez as a proximate result of the negligence of one or more of the defendants?
"Answer: $4,235,996.00
"If you have answered any part of Issue No. 1 'yes,' then answer the next two issues.
*"Issue No. 3.*
"What do you find to be the total amount of damages suffered by plaintiff Mary Ann Rodriguez as a proximate result of this accident?
"Answer: $500,000.00
*"Issue No. 4.*
"Was there negligence on the part of the plaintiff's employer Orvin Engineering Co., or its agents or employees, other than the plaintiff, which contributed as a proximate cause

Thus, liability was imposed by the jury on Norman and Bethlehem; Orvin, not named a defendant by plaintiffs due to its status as plaintiff Richard's employer, was found by the jury to have contributed 10 percent to plaintiff's injuries.

Pursuant to a prior stipulation of the parties, the trial court, sitting without a jury, heard the issues relating to the various cross-complaints. On its cross-complaint against Norman, McDonnell was awarded $52,142.50 with interest.

Norman was awarded judgment on its cross-complaints for express contractual indemnity against both Bethlehem and Orvin in the sum of $4,723,708.62,[4] plus attorney fees of $69,341.94 on the ground that Norman's negligence was "passive," while Bethlehem's and Orvin's negligence was "active."

Judgment was entered for the plaintiffs in the amount of $4,113,122.25 for plaintiff Richard Rodriguez, the trial court deducting from the jury award the total amount of workers' compensation benefits, $122,873.75, which had been provided by State Fund, and in the amount of $500,000 for plaintiff Mary Ann Rodriguez. In entering judgment for State Fund against Norman and Bethlehem, the trial court deducted 10 percent from the total of $122,873.75 because of the jury finding that Orvin was 10 percent negligent, making the net judgment amount $110,586.37.

---

of plaintiff's injury?

"Answer 'yes' or 'no.'

"Answer: Yes

"*Issue No. 5.*

"The combined negligence of the plaintiff's employer, Orvin Engineering Co., or its agents or employees, other than the plaintiff, and of the defendants whose negligence proximately contributed to plaintiff's injury should total 100%. What proportion of such combined negligence, if any, is attributable to plaintiff's employer, Orvin Engineering Co.?

"Answer:

"To plaintiff's employer, Orvin Engineering Co.

 10 %.

"Dated: February 9, 1976

"James E. Thompson
Foreman"

The verdict as to McDonnell Douglas was 11 to 1. The verdict as to Norman, Bethlehem and Cox was unanimous. As to plaintiff Richard Rodriguez' damages, the verdict was 10 to 2. As to plaintiff Mary Anne Rodriguez, the verdict was unanimous. All the jurors agreed that Orvin had contributed to the accident, but the verdict on the percentage of fault was 10 to 2. The same 10 jurors agreed on every verdict.

[4]This sum constitutes the Richard verdict amount of $4,235,996 less $122,873.75 in compensation benefits plus the Mary Anne verdict amount of $500,000, plus State Fund's judgment of $110,586.37 against Norman.

Norman, Bethlehem, Orvin and the plaintiffs made motions for new trial.[5] Bethlehem also made a motion to set aside the judgment and sought judgment notwithstanding the verdict. All the motions were denied.

Bethlehem has appealed from the judgment rendered against it in favor of the plaintiffs, and from the judgment on the cross-complaint rendered against it in favor of Norman. ▮ ▮▮▮▮ In addition, Bethlehem has appealed from the denial of its motion to vacate judgment; from the denial of its motion for judgment notwithstanding the verdict; and from the denial of its motion for new trial.[6] Norman has appealed from plaintiffs' judgment against it.

Plaintiffs have filed a protective appeal from the judgment rendered in favor of McDonnell and Cox.

## I

### *The Factual Background*

#### A. *Introduction*

In 1969, McDonnell decided to modify Building 85, a 50-foot high steel hangar located at its facility in Long Beach, in order to accommodate its new larger DC-10 aircraft.

---

[5]Plaintiffs sought a new trial against defendants McDonnell and Cox, exonerated by the jury.

[6]All are appealable orders (Code Civ. Proc., § 904.1, subd. (d)), except the denial of new trial, which is reviewable here on appeal from the judgment. (*City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860, 871-872 [135 Cal.Rptr. 647, 558 P.2d 545].)

On this appeal, Bethlehem explains that a different judge than the trial judge heard the motions for new trial, and asserts that he was handicapped in hearing the motions because less than a complete transcript in this lengthy trial had been prepared at that point in time. Because of this, defendant Bethlehem asks that we function as a "thirteenth juror" in assessing the evidence with respect to the new trial motions.

We note that a second judge's "power and discretion is as broad as though he had himself been the trial judge" (*Kershner* v. *Morgali* (1957) 152 Cal.App.2d 884, 885 [314 P.2d 105]) when hearing motions for new trial; nor does our record tell us the extent to which the record considered by the second judge was incomplete. We perceive our appellate duty to be the "obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error [complained of] was prejudicial." (*Decker, supra,* 18 Cal.3d 860, 872.) The grounds upon which the motions for new trial were predicated have also been asserted by the defendants on this appeal, and we will deal with the issues as they have been presented here.

McDonnell hired Norman as architect and engineer to draw the requisite plans and specifications. McDonnell then hired Norman as general contractor for the project. The contract between McDonnell and Norman imposed broad responsibility on Norman to supervise the entire remodeling effort, whether performed by Norman personnel or by subcontractors. Included in Norman's responsibility was the maintenance of safe conditions on the job.

The modification plans contemplated demolition of portions of the south wall of Building 85, so that there would be an opening 17 feet high and 45 feet wide. Norman employees commenced demolition activities in April 1970, using acetylene torches and other tools to accomplish their task.

Norman subcontracted certain structural steel work to Bethlehem and, pursuant to its contract with McDonnell, hired a licensed fire protection engineer, Orvin, to modify the existing fire sprinkler system of Building 85.

McDonnell engineers visited the project often, to see that work was progressing according to plan and on schedule. McDonnell employee Bowers, a project engineer, was at the site of modification daily, checking on personnel and enforcing safety regulations. To meet certain requirements of the City of Long Beach, McDonnell retained the responsibility of inspecting the structural steel work, and hired Twining for this purpose; a Twining employee, Barnes, was on the job daily to inspect steel as it was installed—to monitor its strength, and to see that the welding was done properly. Barnes reported to Bowers.

During the modification, Norman had no specifically designated safety engineer on duty. However, its job superintendent, Podratz, was on the scene providing overall supervision. Podratz testified that he did not inspect the structural steel work, relying on the Twining inspector to perform that assignment. Podratz did not inspect the work performed by the fire protection engineer, Orvin, either, because Norman was not licensed in this area; both the McDonnell-Norman contract and applicable law required that the fire protection work be done by a licensed fire protection engineer.

Bethlehem commenced the structural steel work on June 8, 1970. Its plans showed that Bethlehem workers were to remove from the south wall a horizontal steel member some 30 feet in length, known as a girt or

channel iron. The girt was located slightly more than 17 feet above the ground, within inches of the opening in the wall. The girt's flat unchanneled side was up and its "legs," i.e., the channeled portion, was down. It was attached to a similar structure, and was bolted to steel columns at both ends with steel clip angles. Siding and insulation material were attached to the girts.

The plans further showed that the girt in question was to be lowered to the ground, "dressed," and inverted; it was then to be raised, with the "legs" up, into its former position, where it would help form the framework for some louvers which were to be installed. In order to invert the girt, it was necessary for Bethlehem workers to free the girt completely of all attachments, before it could be lowered to the ground.

One such attachment was an angle iron, also known as an earthquake sway brace, approximately 32 inches long, which had been welded to the flat side of the girt near the west end of the wall. The welding of the angle iron to the girt provided the angle iron with its inner support; the angle iron extended through an opening in the steel siding to the outside, where its U-bolt attachment encircled a large vertical metal pipe. The purpose of the angle iron was to provide strong lateral support for the pipe, a part of the fire protection system, so that the pipe would not fall, even during a major earthquake.

Sometime in June 1970, Bethlehem steelworkers freed the girt of attachments, using acetylene torches to melt the steel. The girt was lowered, inverted and reinstalled. No one made a detailed inspection after completion of this project. The angle iron had been freed from the girt at some point in time, but had not been rewelded to it. The angle iron remained in position, however, with its U-bolt encircling the vertical metal pipe outside the building and, from the outside, appeared to be supporting the pipe in the same manner as other angle irons were providing support in other locations at Building 85. The opening through which this unattached angle iron extended outward to the pipe was filled with black mastic, to ensure a snug fit and to keep out moisture; the mastic in effect camouflaged the loose iron from outside view. Bethlehem workers left the premises on July 24, 1970.

B. *The Accident*

The accident occurred on September 21, 1970, during the noon hour. Prior to that date, Orvin had come to the job site to modify the fire

protection system. Plaintiff Richard Rodriguez was a second-period apprentice employed by Orvin.[7] Richard worked under the supervision of a journeyman, Martin, and sometimes under the supervision of an eight-period apprentice, Greedy.

Several weeks before the day of the accident, Richard had assisted Martin in removing a valve from the pipe which was being supported by the unattached angle iron. The pipe was 21 feet in length, rising vertically, attached at the top to another pipe by means of victaulic coupling. The pipe weighed 630 pounds. The two Orvin employees had installed a star valve in the pipe, at a point about seven feet off the ground. The new valve was smaller than the one it replaced, and there was a six-inch gap in the pipe above the valve seat. One method of closing the gap was to free the pipe from its upper coupling, and lower it into position.

On the morning of September 21, three Orvin employees were on the job—foreman Martin, Greedy and plaintiff Richard Rodriguez. Also present was a "cherrypicker," a crane with a boom to which a basket was attached. The crane had been summoned to the jobsite by Orvin and was owned by Cox. The crane was operated by Gerald Gruidl, a Cox employee, and was used by Orvin for various purposes, including the transportation of its workers in the crane basket to pipes rising many feet in the air.

Before noon on September 21, foreman Martin left the immediate premises on a job-connected errand. While he was away, apprentices Greedy and Richard completed their present assignment. The next item on the agenda was the lowering of the pipe.

At the time the valve had been replaced on the pipe, the pipe had been rigged with a wire cable and ratchet, known as a "come-along," device which operates in a manner similar to a jack. The cable, wrapped around the pipe and attached to an inner building structure, was intended to provide additional support for the pipe; the ratchet could be operated to provide the pressure for slowly lowering the pipe into position.

Apprentice Greedy directed the crane operator, Gruidl, to position the crane outside the fence near the western end of the building. Greedy

[7]Each period of apprenticeship was of six months' duration; Rodriguez had worked for Orvin since March 1970. Ten such periods are required before an apprentice sprinkler fitter may become a journeyman.

climbed into the crane basket and was lifted to that portion of the pipe where the "come-along" was attached. He loosened the "come-along" and reattached it near the lower end of the pipe, about seven feet off the ground but below the pipe's center of gravity. Using the ratchet, he tightened the "come-along" for support purposes.

Greedy was then raised in the crane basket to the 17-foot level, where the angle iron and U-bolt extended from the wall and encircled the pipe. To Greedy, the angle iron appeared to be firmly attached; he did not inspect the inside area, but checked the tightness of the U-bolt. Greedy then signalled Gruidl to lift him about 30 feet in the air to the point where the pipe was secured to the upper pipe by the victaulic coupling.

While Greedy was so engaged, apprentice Richard, the "ground man" for the operation, was outside the nearby fence with the crane operator. Greedy yelled at Rodriguez to warn some workmen who were seated eating lunch under the crane basket, to clear the area. Greedy wished them to move "[b]ecause they were directly under me, and if something had fallen or dropped out of my pouch, they would have possibly had an injury." In response to Greedy's command, Richard entered the fenced area and asked the workmen to go elsewhere. They complied with the request, and Richard started to walk toward the fence opening, some 35 or 45 feet away. While he did this, Greedy commenced removal of the victaulic coupling from the pipe, a procedure which took no more than two minutes.

Richard was now 20 or 25 feet away from the ground under the basket. When the coupling was entirely removed from the pipe, the pipe fell, striking Richard on the back of his helmet and the back of his body. Plaintiff Richard fell to the ground with the 630 pound piece of pipe across his legs. As it lay on the ground, the pipe carried with it the unwelded angle iron assembly, and the broken "come-along."

Plaintiffs' expert, engineer Doss, testified that, in his opinion, had the angle iron been properly secured, it was strong enough to have held the pipe as it was being lowered. Doss expressed the opinion that, assuming the existence of the strong lateral support a properly welded angle iron could provide, the method chosen to fill the gap in the pipe, the lowering of the pipe into the valve seat, was a proper procedure. It was also Doss' conclusion that the "come-along" had broken *after* the pipe started to fall; the break in the cable was the result of sudden pressure. And, it was the expert's opinion that had the "come-along" been positioned nearer

the pipe's center of gravity, it, too, would have been strong enough to hold the pipe.

## II

### *The Issue of Defendants' Liability*

More than 40 witnesses appeared at trial and testified concerning the accident. Both McDonnell and Norman engineers had formed the opinion that, had the angle iron been securely attached to the girt, the pipe would not have fallen. Of crucial importance was identification of the individual who had cleanly sheared the angle iron off the girt with a torch, and had neglected to see that it was reattached.

None of the detailed plans of McDonnell, Norman or Bethlehem showed that the angle iron was attached to the girt. There was some question as to whether the angle iron itself was part of the structural steel or was part of the fire protection system; in any event, no one inspected it after the girt was inverted.

Norman had come on to the job site in the spring of 1970; Norman employees Walsh and Gutierrez, working under the direction of Podratz, had used torches to remove siding near the girt, within inches of the angle iron. Neither of them remembered the angle iron or knew who had burned it off.

Bethlehem workers came to the scene in June 1970, and worked there until the end of July 1970. Bethlehem foreman Turner testified that he had walked on the girt before his crew took it down and inverted it; he had seen no angle iron attached. Bethlehem foreman Crowder, who supervised the work of the raising gang, saw no angle iron either. The raising gang's function was to both lower the girt and reinstall it; included in the group were connectors Amick and Durazzo, who did on occasion use torches. Neither could remember burning off the particular angle iron involved. Bethlehem worker Duncan testified in his deposition that he had only worked on the girt after it had been lowered to the ground.

Toward the end of trial, Bethlehem produced a witness, Clark Higgins, who claimed that he had seen employees of Norman working with torches near the angle iron in the week preceding the accident; he testified that he saw "sparks" from torches and saw the angle iron "smoldering." Higgins, an ironworker employed at that time by Robert-

son, was also a witness to the accident itself; he had given a statement to Robertson attorney Lester Miller in 1971, but had not mentioned the earlier incident involving Norman employees.

Norman employee Martin had already testified that he knew of no Norman employee who had the capability to make the clean, efficient cut evidenced on the angle iron (Plaintiffs' exhibit 1). After Higgins had testified, Norman presented the testimony of Podratz and Doss; both had examined the angle iron after the accident, and had formed the opinion that the burning of the iron was not of recent origin.

Although, for the most part, the evidence with respect to liability was circumstantial, there was substantial evidence that defendants Norman and Bethlehem were negligent in their failure to have the angle iron reattached to the inverted girt and in their failure to inspect the inverted girt and observe that there had been no reattachment. The jury so found, declining to impose any responsibility for Richard's injury on McDonnell or Cox.

## III

### *The Refusal to Give Any Instruction on Contributory Negligence*

Defendants contend that the trial court judge committed reversible error when he rejected the instruction offered by them on contributory negligence, and, instead, instructed the jury that plaintiff Richard had not contributed to his injuries.

Refusal to give an instruction on contributory negligence was recently discussed in *Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530 [138 Cal.Rptr. 705, 564 P.2d 857]. There the court stated that "[w]here contributory negligence is asserted as a defense, and where there is 'some evidence of a substantial character' to support a finding that such negligence occurred, it is prejudicial error to refuse an instruction on this issue, since defendant is thereby denied a basic theory of his defense. [Citations.] As in other applications of the 'substantial evidence' principle, the requisite standard cannot be met by mere speculation or conjecture. [Citation.] However, all reasonable inferences in support of the defense will be drawn. [Citation.] [¶] Further, the fact that evidence is 'circumstantial' does not mean that it cannot be 'substantial.' " (*Id.,* at p. 548.) Similarly, it is error to instruct on contributory negligence if there

is no evidence introduced to support a finding thereon. (*Burks* v. *Blackman* (1959) 52 Cal.2d 715, 719 [344 P.2d 301].)

■ Contributory negligence, of course, is "conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, which falls below the standard to which he is required to conform for his own protection. . . . [It] is conduct which involves an undue risk of harm to the actor himself. . . . The plaintiff is required to conform to the same broad standard of conduct, that of the reasonable man of ordinary prudence under like circumstances." (Prosser, Law of Torts (4th ed. 1971) Contributory Negligence, § 65, pp. 416-419.)

■ Defendants argue that the evidence showing contributory negligence on the part of the plaintiff may be found in the circumstance that the two Orvin apprentices, plaintiff Richard and Greedy, undertook the lowering of the pipe while their foreman was absent. No evidence was produced below, however, that Richard, a young and inexperienced apprentice, had taken part in any discussion about how and when to lower the pipe; his role was limited to that of the "ground man," the person who was to run errands, if necessary, when so directed by Greedy, the occupant of the crane basket. Richard, lowest in the chain of command, was expected to and did take orders from Greedy, the more experienced apprentice. Reasonable employees do not desist from the tasks at hand because their ultimate superior is away from his post. In addition, there was expert testimony that the method employed for lowering the pipe was not in and of itself inherently dangerous activity. We find no inference of contributory negligence on plaintiff's part resulting from the fact that Greedy and Richard were working in the absence of their foreman.

Defendants also argue that Richard walked too slowly when he was leaving the area under the basket, and that he exposed himself to danger by turning his back to the basket. Had Richard been stationed under the basket, it would have been foreseeable had he been hit by an object falling therefrom. The record establishes, however, that Richard had left the ground underneath the basket and was 20 or 25 feet away from that area when he was struck by the falling pipe, an event no more foreseeable by a reasonable person in his position than that of a plane falling upon him from the sky. We consider the argument fatuous that would require an individual to run backwards from a dangerous area in order to meet the "reasonable man" standard.

Defendants also urge the point that, to be free from contributory negligence, Richard should not have entered the work area inside the fence at all to warn the seated workmen, or, in the alternative, he should have insisted that work be halted while he did enter the area. This is a specious argument which ignores the fact that the work was being done in a noisy airport setting, and that completion of his assigned task required Richard to address the workmen at close range. Insofar as Richard knew or could anticipate, Greedy was waiting for him to leave the area.

Finally, defendants contend that, to escape the contributory negligence charge, Richard himself should have inspected the inner support of the angle iron in order to make certain it was properly attached, prior to the accident. ▪▪▪ This contention is also lacking in substance. The reasonable man is not required to inspect his surroundings for the purpose of identifying the entire panoply of potential hidden dangers that may lurk around him.

We have found no helpful precedent in evaluating and assessing the evidence of plaintiff's conduct with respect to its conformity to the reasonable-man standard. The decisional law reveals an immense variety of circumstances where evidence of contributory negligence has either been found to exist or to be absent.

We find no evidence here, or any reasonable inference from evidence in the record, which would have supported the giving of a contributory negligence instruction. On the contrary, it would have been error for the trial judge to have given an instruction on contributory negligence because of the absence of any evidence to make the question a jury matter.

IV

*The Admissibility of Evidence Introduced to
Impeach Witness Clark Higgins*

Defendant Bethlehem claims that the trial court committed prejudicial error as to Bethlehem in permitting Norman to introduce evidence for the purpose of impeaching Clark Higgins. Higgins was an ironworker employee of Robertson, produced by Bethlehem late in the trial. Higgins testified that he had seen Norman personnel with torches near the

"smoldering" angle iron the week preceding the accident.[8] Norman, of course, embarked on a search for impeachment evidence.

Norman served a subpoena duces tecum on Chester Miller, an investigator employed by the law firm representing Bethlehem at trial. Miller had interviewed Higgins prior to the latter being called as a witness and had recorded notes of the interviews. Over Bethlehem's objection of hearsay and invocation of the attorney's work-product privilege, the trial court refused to quash the subpoena duces tecum; the notes were produced by Miller, who was then examined, as were the notes, in great detail at an evidentiary admissibility hearing out of the jury's presence. Included in the notes, in addition to what Higgins related about Norman employees, was the recital that Higgins had heard rumors (from an unidentified source) that a Robertson employee had burned the angle iron off the girt.

Higgins had been allowed to leave the courtroom after his testimony without being placed on call, and had gone home to Arizona. He refused all invitations to return. The trial judge authorized the taking of Higgins' deposition in Arizona, pursuant to Code of Civil Procedure section 2024.[9] Trial recessed while all counsel proceeded to Arizona to depose Higgins; there he was questioned about every detail of his contacts with the law firm representing Bethlehem; in the deposition he reiterated his basic testimony; he verified that he had told Miller about the rumor he had heard implicating Robertson.

When trial commenced again, the trial court allowed the deposition of Higgins to be read to the jury. It also allowed defendant Norman to call Miller as a witness and cross-examine him on the contents of his notes, as well as about all of his contacts with witness Higgins. The notes were introduced into evidence (NECO 43) and were reviewed in detail before the jury. The jury was cautioned (and later instructed) that the notes were

---

[8]Higgins testified that he did not know the identity of the two men in question when he first saw them; that he asked them for whom they were employed. A hearsay objection to this question was properly sustained. (Evid. Code, § 1200.) No exception to the hearsay rule was applicable. (See *Markley* v. *Beagle* (1967) 66 Cal.2d 951 [59 Cal.Rptr. 809, 429 P.2d 129].) Later, however, Orvin's counsel asked Higgins what the two men had said as to who was their employer. Higgins answered, without a hearsay objection being made, that the two men had said they worked for Norman. Thus, the jury heard this inadmissible hearsay evidence.

[9]The section provides for taking depositions outside the state in the manner provided by Code of Civil Procedure section 2019, on the issuance of a commission from the trial court pursuant to Code of Civil Procedure section 2018, subdivision (b).

being introduced not to assert the truth of matters contained therein, but for the limited purpose of attacking Higgins' credibility. The jury was also instructed according to BAJI No. 2.22.[10]

Bethlehem claims that the net effect of the trial court's rulings admitting the deposition, Miller's notes and Miller's testimony suggested to the jury that Bethlehem had offered the testimony of an untruthful witness in an effort to avoid responsibility for the accident and to place the blame on codefendant Norman. Bethlehem asserts that it was thus "smeared" in the eyes of the jury, a highly prejudicial circumstance.

■ It is a well-established evidentiary principle that, in order for a witness to be impeached by prior statements, the statements must be inconsistent with either the express or implied testimony of the witness. (Evid. Code, § 780, subd. (h).) If the prior statements of a witness are not inconsistent with any testimony of the witness, implied or express, they are inadmissible to impeach the witness. (See *People* v. *Sam* (1969) 71 Cal.2d 194 [77 Cal.Rptr. 804, 454 P.2d 700]; *People* v. *Spencer* (1969) 71 Cal.2d 933, 948 [80 Cal.Rptr. 99, 458 P.2d 43] (dis. opn. of Mosk, J.).) We have examined Miller's notes. Their contents reveal nothing inconsistent with either Higgins' express testimony or implied testimony. The fact that he *heard* rumors concerning a Robertson employee is not inconsistent with his testimony regarding what he *saw* on another occasion. Hence, the receipt into evidence of Miller's notes and of Miller's testimony as impeachment evidence of Higgins was clearly erroneous.

■ In addition, the notes were an amalgam of the recorded statements of a witness and comments of Miller, as agent for an attorney.[11] That part of Miller's notes which recorded Higgins' statements would not be protected by the attorney's work-product privilege, since recorded or written statements of a prospective witness are considered material of a nonderivative or noninterpretative nature. (*People* v. *Boehm* (1969) 270

---

[10]That instruction reads: "A witness false in one part of his testimony is to be distrusted in others; that is to say, you may reject the whole testimony of a witness who wilfully has testified falsely as to a material point, unless, from all the evidence, you shall believe that the probability of truth favors his testimony in other particulars."

[11]The statutory basis for the attorney's work-product privilege is found in Code of Civil Procedure section 2016, subdivisions (b) and (g). Subdivision (g) sets forth the policy behind the privilege. Subdivision (b) provides, in part pertinent to the issue before us: "The work product of an attorney shall not be discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing his claim or defense or will result in an injustice, and any writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories shall not be discoverable under any circumstances."

Cal.App.2d 13 [75 Cal.Rptr. 590].) But that portion of Miller's notes which consisted of Miller's own comments about Higgins' statement is protected *absolutely* from disclosure by the attorney's work-product privilege as a "writing that reflects an attorney's [or attorney's agent's] impressions, conclusions, opinions, or legal research or theories." (Code Civ. Proc., § 2016, subd. (b); *Boehm, supra,* 270 Cal.App.2d 13; Jefferson, Cal. Evidence Benchbook (1972) § 41.2, pp. 709-712.) Miller's comments were so intertwined with Higgins' recorded statements that all portions of the notes should be held protected by the *absolute* portion of the attorney's work-product privilege.

■ It is argued that Bethlehem could not assert at the trial the attorney's work-product privilege for nondisclosure of Miller's notes because this privilege is only applicable to pretrial proceedings and does not apply at the trial. This argument is erroneous. The attorney's work-product privilege is applicable at trial as well as at pretrial discovery proceedings. Although Code of Civil Procedure section 2016, subdivisions (b) and (g), are contained in the portion of the code dealing with discovery, the policy "to prevent an attorney from taking undue advantage of his adversary's industry or efforts," set forth in subdivision (g)(ii) of the Code of Civil Procedure, can be given adequate effect only if the attorney's work-product privilege is interpreted to apply in both the trial setting as well as in the pretrial discovery setting.

In addition, Code of Civil Procedure section 2032, subdivision (b), creates a waiver of the attorney's work-product privilege for *testimony* of an expert consulting witness at *trial* under the mutual discovery provisions of reports of examining physicians in personal injury litigation. Thus, Code of Civil Procedure section 2032, subdivision (b)(2), provides: "By requesting and obtaining a report of the examination so ordered or by taking the deposition of the examiner, the party against whom an order is made under subdivision (a) of this section [for a physical, mental or blood examination by a physician] or the person examined waives any privilege he may have in that action or any other involving the same controversy, regarding the *testimony* of every other person who has examined or may thereafter examine him in respect of the same condition." (Italics added.)

Certainly, Code of Civil Procedure section 2032, subdivision (b)(2), assumes and recognizes that the attorney's work-product privilege applies to in-court proceedings as well as pretrial discovery proceedings by

making provision for a *waiver* of the privilege with respect to the *testimony* of an expert witness. If the privilege could not be asserted at trial, there would have been no necessity to provide for a waiver of the privilege regarding the *testimony* of a witness. We disagree with the suggestions made in *Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841, 857 [139 Cal.Rptr. 888], and *Mize* v. *Atchison, T. & S.F. Ry. Co.* (1975) 46 Cal.App.3d 436, 448-449 [120 Cal.Rptr. 787], that the attorney's work-product privilege *may* not be applicable at a trial.

We conclude that it was error for the trial court to deny Bethlehem's timely claim at trial of the attorney's work-product privilege to preclude the production of and introduction into evidence of Miller's notes and the testimony of Miller. There is no doubt that the receipt into evidence of Higgins' deposition and the giving of an instruction concerning Miller's notes and the giving of BAJI instruction No. 2.22 compounded the erroneous rulings of which defendant Bethlehem complains.

We consider next whether the errors in these evidentiary rulings necessitate a reversal of the judgment. It is well established that the erroneous admission of evidence is not grounds for reversal of a judgment unless a miscarriage of justice was the result of the errors. (Cal. Const., art. VI, § 13; Evid. Code, § 353.) "A miscarriage of justice should be declared only when the reviewing court is convinced after an examination of the entire case, including the evidence, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error." (*Brokopp, supra,* 71 Cal.App.3d 841, 853.)

It is of significance that the impeachment effort did not lead to defendant Norman's exoneration. The rumor mentioned in the notes referred to Robertson, a circumstance which harmed neither defendant Bethlehem nor defendant Norman, but was potentially most harmful to plaintiffs Richard and Mary Anne Rodriguez, who had dismissed Robertson as a party earlier in the proceedings. We conclude, from the entire record, that defendant Bethlehem would not have been exonerated in any event, whether the Higgins impeachment effort by Norman had been made or not. There was ample convincing circumstantial evidence that implicated both Bethlehem and Norman with respect to the acts of negligence which led to plaintiff Richard's injuries. We do not find here any "miscarriage of justice" which requires a reversal of the judgment in favor of plaintiffs.

V

*The Inappropriateness of a Safety
Order Instruction*

Defendants assert that the trial court committed reversible error when it refused to give an instruction offered by defendant Bethlehem relating to the operation of the Cox crane.[12] ▇ While ordinarily an appellant may not raise an issue involving a ruling in favor of a coparty who has not appealed (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 213, p. 4204), there appears to be an exception to this rule when the appellant can demonstrate actual potential prejudice. Here, defendant Cox was exonerated by the jury and has not appealed; however, the error, if any, in refusing the instruction could be regarded as prejudicial to those defendants, including Bethlehem, who were not similarly exonerated and conceivably thereby were deprived of the right to contribution from a joint tortfeasor. (Code Civ. Proc., §§ 875-879.) Thus we consider that the issue is appropriately before us.

The instruction as offered was based upon BAJI instruction No. 3.45, which sets forth the appropriate instruction for "Negligence Per Se—Violation of Statute, Ordinance or Safety Order."[13] The crane safety order is set forth in 8 California Administrative Code, section 1588.1; it is clearly of the kind to which BAJI No. 3.45 is applicable. (*De Cruz* v. *Reid* (1968) 69 Cal.2d 217 [70 Cal.Rptr. 550, 444 P.2d 342]; *Solgaard* v. *Guy F. Atkinson Co.* (1971) 6 Cal.3d 361 [99 Cal.Rptr. 29, 491 P.2d 821]; *Short* v.

---

[12]The offered instruction read as follows:

"The California Construction Safety Order provides as to the operation of a crane as follows: 'the operator shall be responsible for those operations *under his direct control.* Whenever he doubts the safety of a movement, the operator shall stop hoisting operations until safety has been assured.'

"If you find that an employee of Cox Brothers Crane Services violated the safety order just read to you and that such violation was a proximate cause of injury to another you will find that such violation was negligence unless such party proves by a preponderance of the evidence that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." (Italics added.)

[13]That instruction reads, in pertinent part, as follows: "If you find that a party to this action violated the [safety order] just read to you [and that such violation was a proximate cause of injury to another or to himself], you will find that such violation was negligence . . . ." It is based upon Evidence Code section 669.

The instruction was given to the jury, but only in connection with the responsibility placed upon owners of land and general contractors by the Labor Code to ensure safe working conditions. The instruction was specifically limited to McDonnell and Norman.

*State Compensation Ins. Fund* (1975) 52 Cal.App.3d 104 [125 Cal.Rptr. 15].)[14]

 Evidence Code section 669 creates a presumption of negligence flowing from the violation of a statute (including a safety order or regulation). There are four "basic facts" to this presumption: (1) the violation; (2) the violation as a proximate cause of the injury; (3) an injury resulting from an occurrence of the nature which the statute was designed to prevent; and (4) the injured party being a member of the class of persons for whose protection the statute was adopted.[15]

 By refusing the crane safety order instruction, the trial judge determined as a matter of law that the record contained insufficient evidence to justify the presumptive negligence instruction as to defendant Cox.

The record contains substantial evidence that the injuries to plaintiff Richard were caused by the absence of lateral support for the accident pipe, a fact which might have been discovered by Orvin employee Greedy had he inspected the angle iron support inside the building before commencing the lowering operation.

Cox president McGehee testified that a crane operator is bound by the state safety regulation or order which provides that when a crane operator doubts the safety of any procedure involving the crane, he must stop operation until such time as he regards the operation as safe.

The crane operator, Cox employee Gruidl, testified that he was aware of his responsibilities in this regard, and had had a conversation with Orvin employees Martin and Greedy on the morning of the accident, during which he asked questions about the appropriateness of the proposed method of lowering the pipe. Both Martin and Greedy denied at trial that any such conversation had taken place.

[14]A subsequent amendment to the Labor Code, Labor Code section 6304.5, bars the use of safety orders as evidence in third party personal injury actions. However, the amendment only applies to accidents occurring after April 1, 1972.

[15]The Law Revision Commission's comment to Evidence Code section 669 characterizes the existence of "basic facts" (1) and (2) as issues for jury determination, while the "basic facts" set forth in (3) and (4) are matters of statutory interpretation to be determined by the court. However, the existence or nonexistence of proximate cause becomes a question of law to be decided by the judge if reasonable men can draw but one inference from the facts. (*Satterlee* v. *Orange Glenn School Dist.* (1947) 29 Cal.2d 581 [177 P.2d 279], overruled on other grounds by *Alarid* v. *Vanier* (1958) 50 Cal.2d 617 [327 P.2d 897]; *Cade* v. *Mid-City Hosp. Corp.* (1975) 45 Cal.App.3d 589, 598, fn. 9 [119 Cal.Rptr. 571].)

Gruidl further testified that he had asked questions about the procedure because he had never seen a pipe moved in that manner, although he was aware that a variety of methods was possible. He stated that he ultimately commenced operation of the crane because he believed the procedure to be used was safe. The crane was employed only for the purpose of placing Greedy in a position to work on the pipe, and not for the purpose of actually lowering the pipe itself. Plaintiffs' expert Doss declined to characterize the lowering method employed by Orvin as unsafe per se.

The safety order in question imposes responsibility on a crane operator for matters *"under his direct control."* In our view the order was not applicable to the situation presented in the case at bench where the crane was only *indirectly* involved in Orvin's work. The moving of the pipe was not an operation under the "direct control" of the crane operator. The preliminary determination of the nonapplicability of the order was properly made by the trial court. We find no error in the trial court's refusal to give the presumptive negligence instruction with respect to defendant Cox.

## VI

### *The Issue of Whether the Damages Awarded Were Excessive*

#### A. *The Nature of the Injuries*

As the contention is made on appeal that the award of damages was excessive, we summarize here the relevant medical testimony presented on behalf of plaintiff Richard Rodriguez. Eight doctors described to the jury various aspects of the massive injuries sustained by the plaintiff Richard and problems encountered as a result thereof.

Prior to the accident, Richard Rodriguez had been a happy and healthy young man 22 years of age. He was approximately six feet tall, and engaged in an active life with friends and family. He had been married to Mary Anne, aged 20 years, for 16 months.

Dr. Christos Papatheodorou, a neurosurgeon, treated Rodriguez from the date of the accident until March 1971. The plaintiff's brain had been severely injured by the falling pipe; his spine was fractured and there was substantial, irreparable damage to the spinal cord. Richard's mind

gradually became clear, although he does not remember the events surrounding the accident. It was Dr. Papatheodorou's task to advise Richard and his wife Mary Anne, that Richard would never walk again nor would he ever regain any function in the lower part of his body. Plaintiff Richard is triplegic as a result of this accident, paralyzed from the middle of the chest down. He has lost all bladder, bowel and sexual function. In addition, there are complications associated with the left side of his entire body, ranging from his left eye to a left arm which is practically useless.

The consequences of the spinal cord injury and the resultant paralysis have been tremendously heavy. Shortly after his admission to the hospital after the accident, Richard developed bleeding ulcers which were life-threatening. Dr. John Sweeney, a surgeon, performed a partial gastectomy, removing part of his patient's stomach.

Surgery was later performed on plaintiff's left hand by an orthopedic surgeon, Dr. Eric Widell, in an effort to restore some function. The "tendon transplant surgery" resulted in limited improvement in the left hand, but the arm is still significantly impaired.

Dr. Alan Shanberg, a urologist, was called upon in December 1970, to take charge of bladder, kidney and bowel problems. Richard was experiencing serious infection in these areas. The first surgery performed to provide an alternative method of disposing of urine was a suprapubic cystostomy, which involved placing a tube in the stomach, to which a bag could be attached. The operation was unsuccessful. It was then necessary to form an urethroileo conduit, and an ileostomy was performed. This is a method of urinary diversion effected by opening a hole in the stomach, a stoma, to which a bag-type "artificial bladder" is attached. At some point in time, it may be necessary to repeat this surgical procedure, if the stoma should close. Richard requires enemas and laxatives relative to bowel care; there have been problems with impaction from time to time. Kidney stones and other kidney complications regularly occur in patients with spinal cord injuries; prevention requires a carefully prescribed diet.

In addition, a major area of concern to a triplegic are ulcerated pressure sores, decubitis. Simple weightbearing produces these sores; while the triplegic cannot feel them, such sores may extend from the surface of the skin down to the bone, and osteomyelitis may develop, requiring amputation of the legs. The triplegic must shift position constantly and must avoid such small pressures as those resulting from

wrinkled clothing. Dr. Billy De Shazo, a plastic surgeon, testified that he had operated on three extensive pressure sores developed by Richard, plugging the holes with skin taken from other parts of the body.

Since 1973, Dr. Frederick Amerongen has been the neurosurgeon who has cared for plaintiff Richard. Certain procedures were undertaken to block the constant pain in plaintiff's left arm. Surgery was performed to remove ganglia, but the operation was not successful. Pain remains, particularly when the arm is cold. Dr. Amerongen testified that Richard has clonics (spasms) beyond his control on occasion. Richard must wear a support corset in order to sit up; he cannot bathe himself, nor can he dress and undress himself.

Thomas Gucker III, M.D., an orthopedic specialist, has been the coordinator of Richard's medical care. He operated on Richard to remove a bone deposit which had formed near the right hip; he has also treated Richard with a brine pool immersion technique to heal recurring pressure sores. Dr. Gucker enumerated the various medical specialists who must see Richard several times a year for the rest of his life.

Psychiatrist James McGinnis testified at trial concerning two in-depth interviews he had conducted with plaintiff and his wife, Mary Anne, in 1973 and just prior to trial in 1975. Richard expressed his desire to live. While he and his wife have remained devoted to one another, the details of their daily lives involve matters physically and psychologically overwhelming. By 1975, the burden had become evident.

Several of the treating physicians expressed the opinion that plaintiff Richard has a normal life expectancy, despite his injuries. However, from the date of the accident to time of trial, Richard had been hospitalized 14 times.

B. *The Amount of the Award*

Defendants assert that the size of the award suggests that the jury acted on the basis of passion and prejudice. Upon appeal, we apply the familiar rule that "[a] reviewing court must uphold an award of damages whenever possible [citation] and all presumptions are in favor of the judgment . . . ." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 61 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506-508 [15 Cal.Rptr. 161, 364 P.2d 337].) The fact that an award may set a precedent by its size does not

in and of itself render it suspect. The determination of the jury can only be assessed by examination of the particular circumstances involved. It was cogently stated in *Niles* v. *City of San Rafael* (1974) 42 Cal.App.3d 230, 241 [116 Cal.Rptr. 733]: "The determination of damages is primarily a factual matter on which the inevitable wide differences of opinion do not call for the intervention of appellate courts. [Citation.] An appellate court, in reviewing the amount of damages, must determine every conflict in the evidence in respondent's favor and give him the benefit of every reasonable inference. [Citation.] An appellate court may not interfere with an award unless 'the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' [Citation.]"

In *Niles*, an 11-year-old boy had been rendered mute and quadraplegic due to the negligence of the defendants. The award of damages was $4,025,000. As is true in the case at bench, such items as lost earnings and the need for attendant care were properly considered by the jury in the *Niles* case. It is argued here that since plaintiff Richard Rodriguez is not as limited in movement as was Kelly Niles, the plaintiff in *Niles*, an award larger than the Niles award is subject to criticism. On the other side, seeking to justify the award in the case before us, plaintiffs point to other large personal injury judgments obtained in specific cases in California and in other jurisdictions. This species of argument is not helpful to a reviewing court. For us to measure the validity of an award of damages by making a comparison with other cases would constitute a "serious invasion into the realm of factfinding" specifically disapproved of by the California Supreme Court in *Bertero, supra,* 13 Cal.3d 43, 65, footnote 12. There is no merit in a principle that would countenance measuring a monetary distinction to be applied to triplegia, as opposed to quadraplegia.

The injuries sustained herein can only logically be described as catastrophic. Plaintiff Richard was a young person just beginning a happy and productive life. The power to enjoy sexual relations and to father children has been taken from him. The ability to take care of personal needs is not his to enjoy. Without dispute, the record establishes the unalterable tragic consequences of the injuries—the intense pain and suffering and the recurrent need for hospitalization—as well as the permanent limitations all of this places on the task of just existing and living. As difficult as it may appear to place a monetary value on such a loss, the trier of fact, under our judicial system, must do so. We conclude that the award in this case was within the jury's discretion.

## C. *The Economic Evidence*

Defendants challenge the amount of the award of damages on the ground that the evidence offered by the plaintiffs with respect to wages lost by Richard Rodriguez from the date of the accident to time of trial, and with respect to the loss of future earning capacity, militates against the sufficiency of the evidence to support the judgment.

Plaintiffs did not introduce evidence of the actual amount plaintiff Richard had earned as an apprentice sprinkler fitter prior to the accident. We know of no rule of law that requires that a plaintiff establish the amount of his actual earnings at the time of the injury in order to obtain recovery for loss of wages although, obviously, the amount of such earnings would be helpful to the jury in particular situations.

In the instant case, Richard was an apprentice, without an economic track record of any consequence; information concerning actual earnings at the time of the accident could well have been misleading. The plaintiffs did introduce into evidence the union contract applicable to Richard's employment, which showed, along with other information, the annual increase in wages earned by sprinkler fitters from 1970 forward. This financial data was offered on the assumption that plaintiff would have continued to work at his chosen trade had he not been injured—a reasonable assumption to make.

With respect to loss of future earnings, the decisional law and other authorities carefully point out that "[l]oss of earning power is an element of general damages which can be inferred from the nature of the injury, *without proof of actual earnings or income either before or after the injury,* and damages in this respect are awarded for the loss of ability thereafter to earn money." (*Connolly* v. *Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483, 489 [319 P.2d 343].) (Italics added.)

"[O]ne's earning capacity is not a matter of actual earnings. The impairment of the power to work is an injury wholly apart from any pecuniary benefit the exercise of such power may bring and if the injury has lessened this power, the plaintiff is entitled to recover. . . . In short, the test is not what the plaintiff would have earned, but what he could have earned." (Stein, Damages and Recovery—Personal Injury and Death Actions (1972) § 58, p. 94.) The important distinction just discussed is particularly applicable when the plaintiff is a student or an

apprentice. (See Stein, *supra*, § 84, p. 131; and Johns, Cal. Damages-Law and Proof (2d ed. 1977) § 1.29, pp. 48-49.)

The decisional law in California has long applied the above stated rule. (See *Storrs* v. *Los Angeles Traction Company* (1901) 134 Cal. 91 [66 P. 72] (a 75-year-old retired plaintiff); *Germ* v. *City & County of San Francisco* (1950) 99 Cal.App.2d 404 [222 P.2d 122] (a 56-year-old plaintiff, "addicted to alcohol"); *McCormack* v. *City & County of S.F.* (1961) 193 Cal.App.2d 96 [14 Cal.Rptr. 79] (a 71-year-old widow).) In these decisions, the courts sanctioned recovery by the plaintiffs of damages for impairment of future earning capacity. Similar holdings are found in *Hicks* v. *Ocean Shore Railroad, Inc.* (1941) 18 Cal.2d 773 [117 P.2d 850]; *Ostertag* v. *Bethlehem etc. Corp.* (1944) 65 Cal.App.2d 795 [151 P.2d 647], and *Ridley* v. *Grifall Trucking Co.* (1955) 136 Cal.App.2d 682 [289 P.2d 31].

In *Niles* v. *City of San Rafael, supra,* the court upheld an award of damages to the plaintiff—a minor—in the amount of $503,570 for loss of future earning capacity; the award was based upon statistics of the United States Department of Labor showing the average lifetime earnings of an American male.

In the case before us, in addition to the evidence of the union contract (past and present), the plaintiffs offered the testimony of an expert economist, Robert Edward Schultz, a professor at the graduate school of business at the University of Southern California. He possessed solid educational qualifications and had taught at the University of Southern California since 1952. Schultz's expert qualifications included varied experience as an economic consultant and having been involved as an expert witness in considerable litigation, making projections of future economic trends.

Schultz was asked to make certain economic projections concerning Richard's lost earnings, both past and future, based upon certain assumptions. He had been provided with the union data; it showed that in 1969, a journeyman sprinkler fitter was earning $8.69 per hour, excluding fringe benefits, while in 1976, the same individual would earn $14.66 per hour, exclusive of fringe benefits. Schultz determined that the wages of such a worker had increased during the 1969-1976 period at a rate of 9 percent per year. Schultz also took into account the fact that an apprentice sprinkler fitter's wages constituted a percentage of the journeyman's wages, a percentage which would increase as the apprentice progressed from one apprentice period to the next.

Schultz assumed that Richard would have continued as an apprentice during the period of past lost wages (from 1970 until time of trial) and also assumed that he would have been fully employed; Schultz arrived at a figure for wages lost to time of trial of $111,646. No objection to this testimony was made by the defendants.

With respect to future loss of wages—loss of earning capacity—Schultz arrived at an annual base wage for 1975 of $16.62 per hour, including fringe benefits, totaling $34,569 per year. He then projected this figure into the future on the basis that (1) Richard would have become a journeyman in 1976; (2) he would have worked at his trade for 35 years until he was 62 years of age; (3) he would have received wages increasing annually at a rate of 7 percent; and (4) the wages would have been discounted at a rate of 6 percent. Schultz also assumed that, had he not been injured, Richard would have worked full time, 40 hours per week, 52 weeks of the year (including a paid vacation period), with the exception of the year 1975, as the evidence had established that during that particular year, a 32-hour week was the norm.

By projecting the union wages at a strict hourly rate, without allowance for overtime or "moonlighting" (secondary employment capacity), Schultz calculated that by the year 2010, Richard would have had annual earnings of over $300,000. Schultz arrived at a lost earnings figure, or a loss of earning capacity, of $1,440,144. No objection was made by the defendants to this testimony given on direct examination by Schultz.

On cross-examination, the defendants explored with Schultz the assumptions upon which he had made his calculations. It developed that Schultz had not been informed of what Richard's actual earnings had been prior to the accident, nor did he know what were the *average* annual earnings of a sprinkler fitter, past or present. Defendants elicited from Schultz the estimate that, in the construction industry generally, the average worker was only employed—in Southern California—80 percent of the year at the union rate. Schultz testified that he had not taken this circumstance into account when making his calculations; he did not know if sprinkler fitters followed the construction industry average, commenting that the nature of the work (often inside buildings) was not as subject to weather limitations as some construction work would be. Defendants also cross-examined Schultz with respect to the potential impact on future earnings of strikes, use of nonunion labor and business recession.

Plaintiffs then called as a witness Dofel J. Brunetti, a retired fireman, who explained that the need for fire protection systems in Los Angeles had greatly expanded during his working lifetime, and would expand in the future due to the updating of legal requirements for both old and new construction, in terms of overhead sprinklers and fire protection.

After the testimony of Brunetti, defendants moved to strike the testimony of Schultz, on the ground that his assumptions in making his calculations had no evidentiary support. Plaintiffs resisted the motion to strike on the ground that the motion had not been made in timely fashion. The trial court denied the motion.

In *Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841 [139 Cal.Rptr. 888], plaintiffs offered similar projections of an economist as evidence of future lost wages; the total award (to a quadraplegic and wife) was $3,010,000. Expert economic projection of impaired earning capacity was discussed recently in *Neumann* v. *Bishop* (1976) 59 Cal.App.3d 451, 463-464 [130 Cal.Rptr. 786]. The *Neumann* court rejected the argument that such testimony was too speculative and remote; the court stated that "[i]t was for the jury to determine whether his [the economist's] opinions were based on reliable information." (*Id.,* at p. 463.)

■ It is true that acceptance or rejection of the testimony of any expert witness is within the province of the trier of fact. However, it is incumbent upon the trial judge to determine whether *preliminary* facts have been established, including the foundational material upon which an expert makes his assumptions. (Evid. Code, § 402.) At the time plaintiffs examined Schultz on direct examination, there was no evidence in the record from which a reasonable assumption could be derived that sprinkler fitters had been, or would be in the future engaged in full time employment of 40 hours per week, 52 weeks per year. In fact, evidence adduced on cross-examination of Schultz and from the testimony of Jack T. Lyons, the financial secretary-treasurer of plaintiff Richard's local union, tended to show that full time employment was an assumption lacking in factual foundation.

■ Evidence Code section 353 provides, in pertinent part to the issue before us, that "[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made . . . ." Failure to make a timely motion to strike inadmissi-

ble evidence has long been regarded as a waiver of the right to complain of the erroneous admission of evidence. Timeliness was of crucial importance in the situation presented here; had proper objection been made while plaintiffs' expert was still on the witness stand, and had an appropriate ruling been made sustaining the objection, plaintiffs would have had the opportunity to lay a sufficient foundation for the full employment assumption, or offer modified projections based upon a percentage of full employment and, possibly, the availability of secondary employment for an individual possessing the skill of a journeyman sprinkler fitter.

While there was testimony presented after the motion to strike had been made concerning the opportunities available in different parts of the country for such workers, no definitive data was presented concerning average yearly hours of employment in the industry, past or present. We do not question the fact that an expert economist with wide-ranging knowledge of business conditions may offer his opinion with respect to future earnings. The weight to be given the opinion is dependent upon the reliability of the evidentiary matter used to support that opinion.

However, we find no error in the trial court's ruling refusing to strike the testimony of Schultz; the cross-examination of Schultz exposed the full-employment fallacy upon which his calculations were based, and there was no timely objection to his testimony given on direct or cross-examination (Evid. Code, § 353, subd. (a)); in addition, the jury verdict was not returned in a form from which it can be determined what actual sum the jury allocated for Richard's earnings loss. Unlike *Niles, supra,* the jury was not required to specify particular sums for the various items of damage sought by plaintiffs. But the jury may well have rejected the amounts claimed by the plaintiffs as lost earnings; the verdict was considerably less than the total requested. Furthermore, the gravity of the injuries and the pain and suffering of the plaintiff are of such magnitude that the award is easily justified.

D. *Attendant Care*

Defendants assert that the jury should not have been provided, as it was, with information concerning the past and future cost of attendant care, because the evidence was insufficient to establish the need for such care on the part of plaintiff Richard. This assertion lacks merit.

Dr. Gucker testified that Richard should presently have one and one-half shifts of attendant care, and that, when he reached 45 years of age, two shifts of attendant care were indicated. Dr. McGinnis, a psychiatrist, expressed an opinion that, in years to come, the mental health of Richard and his wife, Mary Anne, would be protected, as would be their interpersonal relationship, if an attendant could provide certain personal care for plaintiff, particularly with respect to problems of bladder and bowel.

From the date of the accident to the time of trial, with the exception of periods of hospitalization, 24-hour-a-day attendant care has been provided to Richard by his wife, Mary Anne. For this care, Richard has received an allowance of $280 per month from the State Fund. It is not too clear from the record why Mary Anne has provided such care without outside assistance; she testified that she had, on occasion, attempted, without success, to find an adequate attendant for her husband. While all of the doctors who testified expressed their admiration for this wife's devotion in caring for her husband, there was evidence that the burden placed upon her has become overwhelming. Dr. Amerongen testified that just prior to trial he had hospitalized Mary Anne for a few days of sleep.

We reject the premise that the cost of attendant care, past or future, should not have been an item for consideration by the jury because of the presence of Mary Anne. It is not part of her duties as a wife to render 24-hour-a-day attendant care. As to past care, the jury was entitled to determine that the sum of $280 per month was not anywhere near enough for the services rendered, in light of the evidence presented by plaintiffs on this issue.

No attack has been made here on the estimate testified to by Schultz concerning the cost of attendant care from the time of the accident to the time of trial, based upon the wage history of such attendants during that period of time—$124,586.

Projecting present wages into the future ($4.50 per hour) and assuming a 5 percent annual increase in those wages, reduced to present value, the economist expressed an opinion that a fund of $693,733 would be required to provide one and one-half shifts of attendant care per day for plaintiff Richard's life (43.8 years from time of trial); a total of $924,978 would be required if another half-shift were added.

In *Rodriguez I, supra,* 12 Cal.3d 382, 409, it was observed that "should [Richard Rodriguez] prevail in his own cause of action against these defendants, he will be entitled to recover, among his medical expenses, the full cost of whatever home nursing is necessary;" obviously, the necessity for attendant care and the reasonable value thereof are questions for jury determination. (*Seedborg* v. *Lakewood Gardens etc. Assn.* (1951) 105 Cal.App.2d 449 [233 P.2d 943].)

It is further argued that any attention or care provided to Richard by his wife, family or friends constitutes a gratuity for which no recovery is allowable. But Richard has not received double recovery for his wife's nursing services; the total amount of benefits provided by State Fund, including the $280 per month, was deducted from his jury award. Insofar as gratuities are concerned, the rule appears to be in keeping with the collateral source rule rationale: "The fact that either under contract or gratuitously such [medical] treatment has been paid for by another does not defeat the cause of action of the injured party to recover the reasonable value of such treatment from the tortfeasor." (*Fifield Manor* v. *Finston* (1960) 54 Cal.2d 632, 637 [7 Cal.Rptr. 377, 354 P.2d 1073, 78 A.L.R.2d 813].)

### E. *Admissibility of Evidence of Inflation*

It is claimed that, in making its award, it was improper for the jury to take into account inflationary trends. California law has long approved consideration of the factor of inflation as a matter of economic reality. (*Burke* v. *City & County of San Francisco* (1952) 111 Cal.App.2d 314, 321 [244 P.2d 708]; *Kircher* v. *Atchison, T. & S.F. Ry. Co.* (1948) 32 Cal.2d 176, 187 [195 P.2d 427].) These authorities were relied upon in *United States* v. *English* (9th Cir. 1975) 521 F.2d 63, 74, in which the court set forth that "a trier of fact may take into account future estimates of changes in the purchasing power of money in arriving at a damage award under California Law." The *English* court cautioned that an estimate of inflation cannot be arbitrarily drawn out of thin air but must be "based on sound and substantial economic evidence, and as can be postulated with some reliability." (*Id.,* at p. 76.) No claim has been made here that the percentages employed by plaintiffs' economist in varying contexts had no basis in fact. We therefore reject this claim of error asserted by defendants.

F. *The Claim That the Awards Were Excessive as a Result of Inflammatory Evidence*

██ Defendants contend that the jury awards of $4,239,996 to Richard and $500,000 to Mary Anne were excessive because the jury was prejudicially affected by the introduction into evidence of certain photographs of plaintiff Richard and by the receipt into evidence of certain testimony concerning Richard's physical condition.

We have examined the photographs which were introduced into evidence. The claim is made that they were "gory," "gruesome" depictions, unnecessarily cumulative of other evidence concerning plaintiff Richard's injuries. While they are not pleasant photographs, they served a relevant function in the fact-finding process. These photographs were relevant on the issue of the nature and extent of plaintiff Richard's injuries to guide the jury in making a fair assessment of adequate compensation for such injuries. The photographs show different portions of the body of plaintiff Richard—the scars, the pressure sores, the opening in his stomach, and the useless legs.

Defendants rely on *People* v. *Gibson* (1976) 56 Cal.App.3d 119, 134 [128 Cal.Rptr. 302], a criminal prosecution, where the judgment was reversed on several grounds, including the introduction into evidence of two photographs of the deceased victim which were "gruesome, revolting, and shocking to ordinary sensibilities." (*Id.,* at p. 135.) Finding the photographs cumulative and calculated to inflame the jury, *with little probative value* on the issue of guilt or innocence, we concluded that the discretion conferred upon the trial court pursuant to Evidence Code section 352 should have been exercised in favor of exclusion. The *Gibson* case is easily distinguishable from the case before us in which the probative value of the photographs was not substantially outweighed by any danger of undue prejudice to the defendants.

It is also asserted that the testimony of eight doctors was unnecessarily cumulative. The assertion is without merit. Each doctor called by the plaintiffs testified in substantial part to different aspects of the medical care that had been provided from the time of the accident to time of trial. That testimony, too, was highly relevant on the issue of damages.

Finally, it is asserted that undue emphasis was placed on plaintiff Rodriguez' impotence, pressure sores, and the problems resulting from disfunction of bladder and bowel. We know of no delicate way of

approaching these subjects, with which plaintiffs must concern themselves on a daily basis.

In connection with the jury award of $500,000 to plaintiff Mary Anne, we take note of the fact that " '[t]he concept of [loss of] consortium includes not only loss of support or services, it also embraces such elements as love, companionship, affection, society, sexual relations, solace and more.' [Citation.]" (*Rodriguez I, supra,* 12 Cal.3d 382, 404-405.) Considering the youth of plaintiffs, the deprivation to be suffered by Mary Anne will extend over an inordinately long period of time.

We conclude that, in light of the evidence, the awards to plaintiffs were reasonable. The injuries to Richard were exceedingly grave and grievous. The defendants make no showing that the amounts of the two awards reflect passion and prejudice as a result of any cumulative or inflammatory evidence. The evidentiary support for the jury's awards is immune from any valid attack.

## VII

### *The Inadmissibility of Evidence of Income Tax Consequences in Wrongful Death and Personal Injury Actions*

In response to plaintiffs' *in limine* motion, the trial judge ruled that the issue of income taxation, in varying contexts, was not to be injected into the trial. On this appeal, defendants challenge this ruling. We are urged to recognize that, in arriving at a damages award, the exclusion of income tax consequences from jury consideration is no longer universally accepted, and that it is time for California to adopt a more modern and realistic approach in this regard.

There is little decisional law in California on this subject. What little there is, however, seems to favor the so-called "majority" rule, which holds that income tax consequences are of no relevance in personal injury litigation. (*Henninger* v. *Southern Pacific Co.* (1967) 250 Cal.App.2d 872, 878 [59 Cal.Rptr. 76]; but see also *Atherley* v. *MacDonald, Young & Nelson* (1956) 142 Cal.App.2d 575, 589 [298 P.2d 700]; and *Anderson* v. *United Air Lines, Inc.* (S.D.Cal. 1960) 183 F.Supp. 97.)

In *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 12, footnote 18 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398], the court noted that federal law excludes, from being subject to income taxation, damages or the proceeds of settlement awarded personal injury plaintiffs. It further stated that the question of whether a jury should be apprised of this fact was an "open" question in California, but that consideration of the issue would not be undertaken at that time because of lack of briefing on the issue.

A more recent Court of Appeal decision involving income taxation and personal injury litigation is *Brokopp* v. *Ford Motor Co., supra*, 71 Cal.App.3d 841, 859, which affirmed a substantial award to a husband and wife. The husband had been rendered quadraplegic due to defendant's negligence. At the trial, the defendant sought to raise the issue of income taxation as it related to the estimate of impaired future earning capacity, by questions directed to plaintiffs' expert economist on cross-examination. The cross-examiner's intention was to elicit the fact that, had plaintiff earned the lost income, he would have received for his use, as a consequence of income taxation, a net amount, rather than the gross amount earned, and that this circumstance should be considered by the jury in computing the loss. The trial court in *Brokopp* sustained an objection to the questions on the ground that they assumed facts not in evidence. This ruling was upheld on appeal.

At the trial in the case at bench, defense counsel argued, outside the presence of the jury, that defendants were entitled to inform the jury that Richard's *net* future earnings, after income taxes, constituted his actual loss, rather than the amount of his gross earnings. But no formal offer of proof was made as to the effect of future income taxation; the discussion consisted of one counsel's "ballpark" estimate that plaintiff would have been in the 18 to 20 percent bracket in terms of income, had he continued in his employment. Another attorney indicated that this issue might be ripe for appellate decision if judgment was awarded against the defendants. Although we could reject defendant's contention because of their failure to make an adequate offer of proof as to the evidence that would be presented on the issue of future income taxation and its effect on Richard's earnings, had he not been hurt (Evid. Code, § 354, subd. (a)), we are inclined to consider the issue on the merits.

There are various contexts in which the impact of income tax consequences in personal injury litigation may be raised. Thus, as pointed out in *Helfend, supra,* there is the fact that the jury award itself is not

subject to income taxation. The rationale for excluding this information from consideration by the trier of fact is that it is irrelevant in terms of the defendant's obligation to pay damages if liability is established; any lack of tax due is a matter involving only the plaintiff and the government; a defendant may not seek benefit therefrom. (See, e.g., *Eriksen* v. *Boyer* (N.D. 1974) 225 N.W.2d 66.) Another basis for exclusion, somewhat similar in content, has been advanced by the Maryland Appellate Court in *Lumber Terminals, Inc.* v. *Nowakowski* (1977) 36 Md.App. 82 [373 A.2d 282, 291-292]. That court stated that, to inform the jury of nontaxability of the award, would constitute a "nullification" of federal congressional intent to benefit the injured party.

A second context revolves around the fact that the average uninjured and employed citizen must regularly yield a portion of his earnings to his government; he receives, in a truly realistic sense, a net rather than a gross income. It is in this area of computation of damages that some jurisdictions have permitted the defendant to introduce evidence of income taxation to affect the amount of the award of damages. Overruling established precedent, England changed its rule of law to allow evidence of estimated net future earnings rather than gross estimated earnings as the measure of earning capacity loss in *British Transport Commission* v. *Gourley* [1956] A.C. 185.

In *McWeeney* v. *New York, N.H. & H. R.R. Co.* (2d Cir. 1960) 282 F.2d 34, the court rejected the concept of net earnings with respect to plaintiffs in the lower income brackets, but recognized that future income taxation would have an impact on the earnings of middle and upper income earners.

The Ninth Circuit has authored a number of opinions favoring awards based upon future loss of net earnings. (See *Furumizo* v. *United States* (D.Ha. 1965) 245 F.Supp. 981, affd. (9th Cir. 1967) 381 F.2d 965; *United States* v. *English* (9th Cir. 1975) 521 F.2d 63; *Burlington Northern, Inc.* v. *Boxberger* (9th Cir. 1975) 529 F.2d 284; *Felder* v. *United States* (9th Cir. 1976) 543 F.2d 657.) *Furumizo* spoke of the deduction of estimated income tax from an award as "the more modern and reasonable" rule. (245 F.Supp. 981, 1014.) *Boxberger* rejected the argument that such consideration would be unduly speculative, observing that ". . . Such considerations are no more speculative than the possibility of death from natural causes, disabling, non-compensable injuries from other causes, or the future instability of familial relationships." (*Boxberger, supra,* 529 F.2d 284, 293.)

The *Boxberger* court also rejected the argument that the injection of the issue of the effect of future income taxation would place an undue burden on the jury. "[T]oday's sophisticated jurors surely have had some personal experience in determining their own tax liability, and in today's tax-conscious society, we are confident that our juries and judges, with the aid of such competent expert testimony as may be received, are equal to the task and the responsibility. . . . [T]his approach more accurately harmonizes with fair economic reality, more justly achieves the goal of compensating claimants for the actual loss suffered, and safeguards against the injustice of overcompensation." (*Id.,* at pp. 293-298.)

It should be noted that. for the most part, these federal cases dealt with liability under the Federal Tort Claims Act. Under the act, claims are determined by a schedule of deductions, a somewhat different procedure than that employed in state personal injury litigation (e.g., there is an amount deducted from the award for the personal expenditures of the decedent during the period of life expectancy). In addition, it is to be noted that *Boxberger* limited its holding to cases involving federal law and to cases in state jurisdictions which have been silent on the subject. (*Boxberger, supra,* 529 F.2d 293, 298, fn. 18.)

A third area where income tax considerations might be of significance concerns the matter of the future investment of the award received. Interest rates, of course, vary with the type of investment, and it is commonly known that investment in certain types of bonds now produces a return free from income taxation. In the case at bench, defendants sought to raise this issue in terms of the advantage plaintiffs could obtain if their awards were invested in a way which reduced or avoided income tax consequences. In rejecting the defense effort, the trial court ruled that this was an attempt to do indirectly what the court had already determined could not, under present California law, be done directly, i.e., introduce the issue of tax considerations into the trial. Again, defendants failed to make a valid offer of proof. (See Evid. Code, § 354, subd. (a).) The court was not informed of the *evidence* the defendants sought to introduce to establish the fact that certain types of investment produce tax-free income.

It is our view that adoption of the rule which would permit the introduction of evidence of future tax consequences to affect the amount of an award in personal injury and wrongful death actions would open the door to *intense speculation* about the future on the part of the jury. The ramifications of such a rule of law could be immense. The less

speculation that is involved in the jury's fact-finding process, the more likely will jury awards conform to the standard of fairness and justice between litigating parties. Furthermore, since the aim of the legal rule that would permit a jury to take future tax consequences into account in fixing the amount of an award is to determine the *net* loss to a plaintiff, a logical sequel would mandate that a jury be permitted to know the consequences to the plaintiff of the latter's obligation, customary in personal injury and wrongful death litigation, to pay attorney's fees from the award—a consideration that is now deemed so impermissible that its use by the jury constitutes jury misconduct, necessitating reversal of the judgment. (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 81 [137 Cal.Rptr. 863, 562 P.2d 1022].) We conclude that the trial court did not commit error in refusing to admit evidence of future tax consequences to affect the determination of the amount of the awards to plaintiffs.

## VIII

*Apportionment of Damages Between State Fund,*
*the Workers Compensation Carrier Intervener,*
*and Defendants Norman and Bethlehem*

Defendant Bethlehem attacks the trial court's computation of the effect of Orvin's negligence (10 percent) upon the claim of the plaintiff in intervention, Orvin's insurer—State Fund. We agree that the trial court's attempt to correlate and apply the principles involved in the no fault system of workers compensation law concerning third party litigation (*Witt* v. *Jackson* (1961) 57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641]) and newly developed rules of comparative fault (*Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]; *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899]) resulted in an error in the apportionment of damages between plaintiff in intervention and defendants Bethlehem and Norman.

Pursuant to the statutory scheme of workers compensation, an employee injured during the course of his employment receives limited benefits from his employer irrespective of fault, but his recovery from his employer is ordinarily limited to those benefits. (Lab. Code, § 3601, subd. (a).) If such an employee receives his injury as a result of the negligence of a third party, he may sue the third party for all of his damages. (Lab. Code, § 3852.) While the employer in this situation is immune from suit by the third party unless there exists between the employer and third

party an express written contract of indemnity (Lab. Code, § 3864), the employer who must pay the workers compensation benefits may sue the negligent third party to obtain reimbursement for funds so expended on behalf of the injured employee; in this respect, the interests of and law applicable to the employer and employee are substantially the same. (*County of San Diego* v. *Sanfax Corp.* (1977) 19 Cal.3d 862, 874 [140 Cal.Rptr. 638, 568 P.2d 363].) Under California law prior to *Li*, the contributorily negligent employer was barred from obtaining reimbursement from a negligent third party for benefits paid to the injured worker, on the ground that no one may benefit from his own wrongdoing. (*Witt* v. *Jackson, supra.*) *Li*, however, rejected the rule that one who is contributorily negligent is completely barred from recovery for damages sustained as the result of another's negligence, but adopted in its place a system of comparative negligence, whereby liability is borne by those whose negligence caused the damage in direct proportion to their respective fault. But *Li* left unresolved various intricate problems of third party litigation, including application of *Li* principles to cases such as the one at bench.

Here, plaintiff Richard was awarded damages of $4,235,966 by the jury. The trial court properly deducted from that award the sum of $123,873.75 as the amount of workers compensation benefits provided him by State Fund (on behalf of the employer, Orvin), to prevent double recovery. (See *Witt, supra.*) Accordingly, Richard's recovery was reduced to the sum of $4,113,122.35.

Following the guidelines set forth in BAJI instructions No. 15.16 et seq., the trial court deducted from State Fund's total claim of $122,873.75 a sum equal to 10 percent of that amount, representing the percentage of negligence the jury had attributed to Orvin, Richard's employer. State Fund's intervention claim was reduced to a judgment in the amount of $110,586.37 against the defendants. If the principles of *Witt* had been applied, State Fund would have been barred from recovering anything due to Orvin's negligence, but the trial court's reduction of the State Fund *claim* by 10 percent was not a proper application of the principles of *Li* in assessing fault on a comparative basis.

The trial court was faced with a similar situation in *Arbaugh* v. *Procter & Gamble Mfg. Co.* (1978) 80 Cal.App.3d 500 [145 Cal.Rptr. 608]. There the injured employee had sustained total damages of $340,000. The jury found that his employer was 50 percent responsible for those injuries. In the suit against the third party tortfeasor, the employer claimed

$44,836.17 for workers compensation benefits paid the employee. The trial court deducted 50 percent from the claim, which resulted in the third party's bearing the lion's share of the judgment in favor of the injured employee and paying its equally negligent concurrent tortfeasor (the employer's carrier) one-half of its claim.

The *Arbaugh* court affirmed the judgment for the plaintiff, but reversed the judgment in favor of the employer, holding that the proper computation of damages involved applying the .50 percent comparative negligence to plaintiff's *total* damages rather than to the employer's claim. Since 50 percent of $340,000 was $170,000, the employer who had expended only $44,836.17 was entitled to no reimbursement and would have been unable to obtain reimbursement unless and until it paid workers compensation benefits in excess of $170,000. While this analysis did not result in an equal sharing of the judgment in favor of the injured plaintiff, due to the employer's immunity, it lessened, on a more equitable basis, the amount to be borne by the third party—a result more in keeping with the comparative fault principles established by *Li.*

Applying *Arbaugh* to the case at bench, it may be seen that 10 percent of Richard's total damages was $423,600—an amount far in excess of State Fund's claim of $122,873.75. Thus, State Fund was not entitled to recovery of any amount as reimbursement from the defendants, and that portion of the judgment must be reversed, as we find *Arbaugh* persuasive on the point.[16]

 Defendants claim that, in keeping with the principles of *Li,* plaintiff Richard's award of $4,235,996 should have been reduced by 10 percent because of the employer Orvin's negligence. However, as *American Motorcycle* tells us, *Li* has not altered the rule that tortfeasors retain joint and severable liability for all the damages of an injured plaintiff. The wisdom of the ruling is evident. As between an injured plaintiff and a third party negligent defendant, the plaintiff should not be deprived of being made whole for the benefit of the third party simply because the plaintiff was injured during the course of his employment. It is still the law that, insofar as the injured plaintiff is concerned, each defendant held liable must bear the responsibility for the entire judgment.

---

[16]A case involving somewhat similar computation, in terms of a *credit* claimed by an employer in compensation proceedings, is now before the Supreme Court in *Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 829 [150 Cal.Rptr. 888, 587 P.2d 684].

## IX

### Norman's Contractual Right of Indemnity
### Against Bethlehem and Orvin

After the jury's verdicts in the main action, the issue was tried by the court, without a jury, with respect to whether Norman, the general contractor, was entitled to indemnity from subcontractors Bethlehem and Orvin by reason of the indemnity provisions contained in the Norman-Bethlehem and Norman-Orvin contracts. The trial court made findings of fact and conclusions of law in support of a judgment of indemnity in favor of Norman and against Bethlehem and Orvin. In essence the trial court construed the indemnity provisions of the two contracts as "general" indemnity provisions; it determined that Norman was only "passively" negligent and was thus entitled to indemnification from both Bethlehem and Orvin.

Bethlehem and Orvin have both appealed from the indemnity judgment in favor of cross-complainant Norman, claiming that the court erred in its interpretation of the contractual clauses in question, and that the evidence was insufficient to support a finding that Norman's negligence was of the "passive" variety. In addition, both Bethlehem and Orvin contend that application of comparative negligence principles is proper, and would alter the result reached below, which, in effect, exonerates Norman from ultimate responsibility for any portion of the Rodriguez judgment.

 We start with the principle that it is an appellate function to interpret the contractual clauses in question, there being no extrinsic evidence introduced to support any claimed interpretation. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) The two contractual indemnity provisions presented here are substantially identical, with the exception of one word, "negligent," inserted in the Norman-Bethlehem clause and which does not appear in the Norman-Orvin clause.[17]

---

[17]"Contractor [Bethlehem, Orvin] agrees to indemnify NECO [Norman] against, and hold NECO harmless from, any and all claims, liabilities, obligations, and causes of action of whatsoever kind or nature for injury to, or death of, any person (including NECO's employees), and for injury or damage to or destruction of property (including NECO's property), resulting from any and all *negligent* acts or omissions of Contractor or Contractor's employees, agents, or invitees, or any Subcontractor of Contractor, or any of such Subcontractor's employees, agents, or invitees." (Italics added.)

In substance the indemnity clauses provide that Bethlehem and Orvin agree to indemnify Norman against claims for injury or death to any person "resulting from any and all negligent acts or omissions" of Bethlehem or Orvin, including their employees. It is the contention of Bethlehem and Orvin that such an indemnity clause should be interpreted to limit Norman's right of indemnity to the situation in which Bethlehem's and Orvin's liability as indemnitors for injury or death to a third person rests *solely* on the negligent acts of, the indemnitor, and not to cover the situation where the indemnitor's liability to a third person is based both on the indemnitor's negligence and the indemnitee's negligence as concurring proximate causes of the third person's injury or death.

It is the thesis of Bethlehem and Orvin that their indemnity agreements with Norman were not to indemnify Norman as indemnitee for any liability to a third person based upon Norman's negligence even though Norman's liability might be based in only small part on its own negligent acts or omissions and the far greater degree of liability rested on the negligent acts of Bethlehem and Orvin, the indemnitors. Thus, argue Bethlehem and Orvin, since the injury to Richard Rodriguez was caused in part by Norman's negligence, Norman can claim no right of indemnity against Bethlehem or Orvin for the Rodriguez judgment against Norman.

For their asserted interpretation of the indemnity clauses herein involved, Bethlehem and Orvin rely primarily on *MacDonald & Kruse, Inc.* v. *San Jose Steel Co.* (1972) 29 Cal.App.3d 413 [105 Cal.Rptr. 725], in which the court classified indemnity clauses into three categories: (1) An indemnity clause that provides "expressly and unequivocally" that the indemnitor shall indemnify the indemnitee even though the indemnitee's liability to the third person arises out of the indemnitee's own negligence. (2) An indemnity clause that provides that the indemnitor will indemnify the indemnitee for the indemnitee's liability to a third person "howsoever same may be caused," but which does not expressly provide that the indemnitor shall indemnify the indemnitee for the indemnitee's liability to a third person arising out of the indemnitee's own negligence. Under this second type of indemnity clause, the indemnitee is entitled to indemnity if the indemnitee's negligence is "passive" but not if the indemnitee's negligence is "active." (3) An indemnity clause that provides that the indemnitor will indemnify the indemnitee for the indemnitee's liability to a third person arising out of the indemnitor's acts or omissions but which is silent as to the indemnitee's liability to a third person arising out of negligent acts of persons other than the indemnitor.

Under this third type of indemnity clause the *MacDonald & Kruse* court held that the indemnitor has *not* contracted to indemnify the indemnitee for liability to a third person arising in whole or in part out of anyone's negligent acts other than those of the indemnitor, and that it makes no difference if the indemnitee's negligent acts which concur with the indemnitor's negligence in causing the indemnitee's liability to the injured person is classified as "active" or "passive."

In the case before us, the indemnity clauses are similar to the third classification set forth in *MacDonald & Kruse,* and, if this classification is deemed good law, the trial court erred in granting indemnification to Norman since Norman, as indemnitee, was negligent along with Bethlehem and Orvin, indemnitors, in causing Norman's liability for the injuries to Richard Rodriguez.

But Norman asserts that the rule set forth in *MacDonald & Kruse* is not viable in view of the California Supreme Court case of *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622 [119 Cal.Rptr. 449, 532 P.2d 97], decided three years after the appellate court decision in *MacDonald & Kruse.* In *Rossmoor,* the indemnity clause provided that the indemnitor would indemnify the indemnitee for the indemnitee's liability to a third person for all claims for damages " 'arising out of Contractor's [indemnitor's] execution of the work covered by this contract.' " (*Rossmoor, supra,* 13 Cal.3d 622, 626, fn. 1.) There was no mention in the *Rossmoor* indemnity clause of the indemnitor's responsibility for acts or omissions of the indemnitee or other persons apart from the acts or omissions of the indemnitor.

The indemnitor's promise in *Rossmoor* to indemnify the indemnitee for the indemnitee's liability to an injured person arising out of the *indemnitor's execution of the contract* appears to us to be substantially the same as the indemnitor's promise in *MacDonald & Kruse* and in the case at bench to indemnify the indemnitee for the latter's liability arising out of the *negligent acts or omissions—or just the acts or omissions—of the indemnitor.*

In interpreting the type of indemnity clause found in *Rossmoor,* the court explained that "[i]f an indemnity clause does not address itself to the issue of an indemnitee's negligence, it is referred to as a 'general' indemnity clause. [Citations.] While such clauses may be construed to provide indemnity for a loss resulting in part from an indemnitee's *passive* negligence, they will not be interpreted to provide indemnity if an

indemnitee has been *actively* negligent. [Citations.]" (*Rossmoor, supra,* 13 Cal.3d 622, 628.) (Italics in original.)

The *Rossmoor* court concluded: "Since the agreement does not state what effect Rossmoor's negligence will have on Pylon's obligation to indemnify, the clause is a 'general' indemnity provision, and under existing case law Rossmoor may not benefit from the agreement if it is deemed actively negligent . . . . The trial court has found, however, that Rossmoor was at most passively negligent. We are not persuaded that this determination was erroneous." (*Rossmoor, supra,* 13 Cal.3d 622, 629.)

Bethlehem and Orvin argue that the *Rossmoor* decision cited *MacDonald & Kruse* but without criticizing or overruling it, thus leading to the conclusion that *Rossmoor* did not consider the *MacDonald & Kruse*-type indemnity clause to be the same as the indemnity clause found in *Rossmoor.* It is true that *Rossmoor* cites *MacDonald & Kruse* and makes no mention of disapproving any part of that decision. But *MacDonald & Kruse* is cited by *Rossmoor* for the proposition that provisions in indemnity contracts that purported to hold an indemnitee harmless from claims arising "from any cause whatsoever" and without expressly mentioning an indemnitee's negligence, have been deemed to be "general" clauses. This reference by *Rossmoor* to *MacDonald & Kruse* cannot logically be interpreted as an approval of the three classifications of indemnity contracts made by *MacDonald & Kruse.*

The interpretation of the *Rossmoor*-type indemnity clause as being a "general" indemnity clause with the resultant effect dependent upon whether the indemnitee's negligence is active or passive was continued in *Gonzales* v. *R. J. Novick Constr. Co.* (1978) 20 Cal.3d 798 [144 Cal.Rptr. 408, 575 P.2d 1190], and in *E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497 [146 Cal.Rptr. 614, 579 P.2d 505]. We hold that the *MacDonald & Kruse* classification is no longer tenable in light of *Rossmoor.* This is also the view expressed by *Herman Christensen & Sons, Inc.* v. *Paris Plastering Co.* (1976) 61 Cal.App.3d 237 [132 Cal.Rptr. 86].

There can be no quarrel with the rule that an indemnitor may provide in an indemnity clause that the indemnitor will indemnify the indemnitee for the indemnitee's liability to a third person that results *solely* from the negligent acts of the indemnitor and thus preclude an even *passively* negligent indemnitee from obtaining indemnification from an indemnitor who is concurrently and *actively* negligent. Thus the *E. L. White* court observed: "Even an indemnitee who has been only *passively*

negligent may be precluded from indemnification *if* the contractual provision agreed upon provides indemnity *only* for liabilities resulting from acts of the indemnitor and *not* from those of others." (*E. L. White, supra,* 21 Cal.3d 497, 507.) (First italics in original; all other italics added.) But the indemnity clauses before us in the Norman-Bethlehem and Norman-Orvin contracts do *not* contain provisions that limit the indemnitor's indemnification liability to the situation where the indemnitee's liability to a third person is based *solely* on the negligent acts of the indemnitor and not in part on the negligent acts of the indemnitee or persons other than the indemnitor.

Since we conclude that the indemnity clauses before us are "general" indemnity clauses, with no mention of negligence of the indemnitee, we direct our inquiry to the issue of whether Norman's negligence was "active" so as to preclude indemnity against Bethlehem and Orvin, or was "passive" so as to permit such indemnity.

 The trial court determined that it was Bethlehem who disengaged the accident pipe's lateral support and neglected to reattach it. It further determined that Norman's negligence consisted of its failure to inspect the work of its subcontractor. *Rossmoor* tells us that "[p]assive negligence is found in mere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty imposed by law. [Citations.] Active negligence, on the other hand, is found if an indemnitee has personally participated in an affirmative act of negligence, was connected with negligent acts or omissions by knowledge or acquiescence, or has failed to perform a precise duty which the indemnitee had agreed to perform." (*Rossmoor, supra,* 13 Cal.3d 622, 629.)

"The crux of the inquiry is to determine whether there is participation in some manner by the person seeking indemnity in the conduct or omission which caused the injury beyond the mere failure to perform a duty imposed upon him by law." (*Morgan v. Stubblefield* (1972) 6 Cal.3d 606, 625 [100 Cal.Rptr. 1, 493 P.2d 465].) Ordinarily, the issue is a question of fact, to be determined by the trier of fact; it is reviewable on appeal by the substantial evidence standard. "Whether conduct constitutes active or passive negligence depends upon the circumstances of a given case and is ordinarily a question for the trier of fact . . . ." (*Rossmoor, supra,* 13 Cal.3d 622, 629.) However, if the evidence establishing the "active" quality of the negligence is so clear and undisputed that reasonable persons could not disagree, the fact of active negligence may

be determined as a matter of law. (*Cahill Bros., Inc.* v. *Clementina Co.* (1962) 208 Cal.App.2d 367, 382-383 [25 Cal.Rptr. 301].)

With these principles in mind, we consider the record before us. It seems clear that, while the testimony established that both Norman and Bethlehem had the means and opportunity to cut the angle iron free from the girt, it was Bethlehem's specific task to free the girt from all attachments, lower it and invert it, before returning the girt to position. It is reasonable, under all of the circumstances, to place primary responsibility on Bethlehem. We cannot say that, as a *matter of law*, Norman's activities around the area amounted to "personal participation" in the negligent activity. While more than one reasonable inference may be drawn from the evidence, the test is whether the trial judge determined the result on the basis of substantial evidence. We conclude that he did. Norman's failure was its failure to inspect; Bethlehem and Orvin were far more actively involved.

Both Bethlehem and Orvin contend that the adoption of comparative fault and comparative indemnity principles in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], and *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], mandates that indemnity between Norman, Bethlehem and Orvin be that of partial indemnity on a comparative fault basis. We reject this contention. It will be remembered that the jury found both Norman and Bethlehem to be negligent and determined also that Orvin was 10 percent negligent.

In adopting a principle of partial indemnity between concurrent tortfeasors on a comparative fault basis, *American Motorcycle* was modifying the all-or-nothing common law doctrine of *equitable indemnity*. As the court explained in *Peters* v. *City & County of San Francisco* (1953) 41 Cal.2d 419, 431 [260 P.2d 55], "a right of indemnification may arise as a result of *contract* or *equitable considerations* . . . ." (Italics added.) None of the discussion in *American Motorcycle* leads to the slightest suggestion that the court was addressing itself to the all-or-nothing right of indemnification that is created by the parties to an indemnity contract. "[T]he question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded." (*Rossmoor, supra,* 13 Cal.3d 622, 633; see also *E. B. Wills Co.* v. *Superior Court* (1976) 56 Cal.App.3d 650 [128 Cal.Rptr. 541].)

With respect to Orvin, the evidence is substantial that the conduct of Orvin employee Greedy contributed to the accident which befell plaintiff Richard Rodriguez. The jury determination that Orvin was 10 percent at fault was only of importance in apportioning the total damages of plaintiff between the negligent parties in accordance with workers compensation law. Orvin, independent of its status as Richard Rodriguez' employer, undertook to indemnify Norman. It is on this basis that Orvin, along with Bethlehem, becomes ultimately responsible for the Rodriguez judgment.

Labor Code section 3864 provides: "If an action as provided in this chapter prosecuted by the employee, the employer, or both jointly against the third person results in judgment against such third person, or settlement by such third person, the employer shall have no liability to reimburse or hold such third person harmless on such judgment or settlement *in absence of a written agreement so to do executed prior to the injury.*" (Italics added.) Orvin did execute such an undertaking.

The judgment in favor of plaintiffs Richard Rodriguez and Mary Anne Rodriguez is affirmed. Plaintiffs' protective appeal against McDonnell Douglas Corporation and Cox Brothers Crane Service is dismissed. The judgment in favor of State Compensation Insurance Fund, plaintiff in intervention against Norman Engineering Company and Bethlehem Steel Corporation is reversed with directions to the trial court to enter judgment in favor of defendants Norman Engineering Company and Bethlehem Steel Corporation and against plaintiff in intervention State Compensation Insurance Fund. The judgment in favor of Norman Engineering Company on its cross-complaint against Bethlehem Steel Corporation and Orvin Engineering Company is affirmed.

As between defendants and intervener State Compensation Insurance Fund, defendants shall recover 10 percent of their costs.

Files, P. J., and Kingsley, J., concurred.

Petitions for a rehearing were denied January 17, 1979, and the opinion and judgment were modified to read as printed above. The petitions of appellants Bethlehem Steel Corporation, Orvin Engineering Company and Norman Engineering Company for a hearing by the Supreme Court were denied March 29, 1979.